## HOOPER–MANKIN CO. v. MATTHEW ADDY CO.

(Circuit Court of Appeals, Sixth Circuit. March 6, 1925.)

No. 4128.

**1. Corporations ⬤188—Identity of stockholders, or control of one corporation over another through stock ownership, does not make one agent of another.**

That stockholders in two corporations are same, or that one corporation exercised control over another through stock ownership or identity of stockholders, are not facts making either corporation agent of the other, or merging them into one, so as to make one liable on contract of the other.

**2. Corporations ⬤521—Evidence held insufficient to require submission to jury of issue whether corporation was agent and instrumentality of defendant company.**

Evidence of corporate control through stock ownership, manner of stock sales, similarity of name, stationery, use of corporate insignia, representations of sales agents, credit reports, and fact that joint offices were maintained and financial aid given, *held* insufficient to require submission to jury of question whether corporation was agent or instrumentality of defendant company.

In Error to the District Court of the United States for the Southern District of Ohio; Smith Hickenlooper, Judge.

Action by the Hooper-Mankin Company against the Matthew Addy Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Murray Seasongood, of Cincinnati, Ohio (Paul W. Scott, of Huntington, W. Va., and F. E. Wood, of Cincinnati Ohio, on the brief), for plaintiff in error.

John W. Peck and Julius R. Samuels, both of Cincinnati, Ohio (Nelson B. Cramer, of Cincinnati, Ohio, on the brief), for defendant in error.

Before DONAHUE, MACK, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. Plaintiff in error brought this action at law against defendant in error on an account for coal sold and delivered by plaintiff to the Matthew Addy Steamship & Commerce Corporation (hereinafter called the Steamship Company) under written contract therefor, in form between plaintiff and the Steamship Company, and charged on plaintiff's books against that company, upon the theory that the Steamship Company was merely an agent or instrumentality of the Matthew Addy Company. The petition contained no charge of misrepresentation or of concealment or misappropria-tion of assets. At the conclusion of plaintiff's evidence the judge directed verdict for defendant, for lack of substantial testimony to support plaintiff's contention.

The general situation as shown by the tendency of the testimony introduced or offered by plaintiff is this:

The Matthew Addy Company was a corporation under the laws of Ohio, doing a large business in coal, coke, and pig iron, with offices both in Cincinnati and New York. It had done comparatively little export business.[1] In the fall of 1919, when there was a large foreign demand for coal, it decided to increase its export trade, and engaged for that purpose two men—Heffernan and Pratt—installing them in defendant's New York office as early as November, 1919, as "Heffernan & Pratt, Export Agents." The two, while on salary, were apparently partners as between themselves. Neither had previously been in the employ of the Matthew Addy Company. Heffernan, during the World War, had organized the Wheat Export Company, as the American unit of the English Commission on Wheat Supplies, and as manager of that Export Company had superintended the delivery at the seaboard of a large amount of wheat for such export. Before 1916 or 1917 he had had considerable experience in business and industrial lines. Pratt had been an officer of the United States Navy for something more than two years, and—presumably through his purchasing experience thereunder—was thought to have connections enabling him to obtain tonnage at lower prices than others generally could get.

Until at least the 1st of January, 1920, the Matthew Addy Company continued to operate its new export department in its own name, through Heffernan & Pratt as export agents. On December 31, 1919, the Steamship Company was organized under the laws of Delaware. In connection therewith, and as of January 15, 1920, the Matthew Addy Company and Heffernan & Pratt conveyed to the Steamship Company all their interest in the contracts and negotiations for purchase, sale, or charter of ships, and the purchase or sale of merchandise for export or import, belonging to the transferrors, intending apparently to include the results of the period of development during the employment of Heffernan & Pratt; the Steamship Company agreeing to pay to the Matthew Addy Company, out of profits, but not

---

[1] It had offices in several Eastern and Midwestern cities, and through its Philadelphia office did some export business.

out of capital, about $51,000 claimed to have been expended by the Matthew Addy Company during the development period referred to. The Steamship Company was organized with an authorized capital stock of $5,000,-000, 7 per cent. preferred, without vote, and 50,000 shares of voting, no-par common, stock, with authority to begin business when $100,000 of the preferred stock was fully paid and 1,000 shares of common stock at $1 per share. The Matthew Addy Company, on the one hand, and Heffernan & Pratt, on the other, were entitled to subscribe each for one-half the common stock. There was actually issued something more than the required amount of common stock, which the evidence indicates was paid for, and of which the Matthew Addy Company and its representatives, by agreement with Heffernan & Pratt, took slightly more than one-half. The Matthew Addy Company also subscribed for $100,000 of the preferred stock (the certificate being taken in the name of its treasurer, Lambert, as trustee), all of which stock, according to what we think the only reasonable construction of the testimony, was paid for in full by that company, probably through the transfer to the Steamship Company of $100,000 previously deposited by the Matthew Addy Company in the Irving Bank of New York while the Matthew Addy Company owned and operated the export department in question.

Each of nine others, interested in one or both companies, subscribed for $100,000 of the preferred stock, paying for the same only by depositing it as collateral to purchase-money notes bearing interest, with the arrangement that dividends should be applied against such interest. There was undisputed testimony by several of the preferred stock subscribers that they were assured that neither they nor their respective estates would be held bound for such payment; also that none of them were financially responsible for the amount of their respective notes. In the case of each such subscriber (excepting one who could not pass medical examination) life insurance policies in the amount of the par value of the stock were taken out for the benefit of the Steamship Company, and at its premium expense. Heffernan and Pratt became president and vice president, respectively, of the Steamship Company, at the time of its organization. On March 1, 1920, the common stock holders gave their voting rights to four trustees, Heffernan and Pratt, who were not officers, directors, or employees of the Matthew Addy Company, and Cramer and Lambert, both of whom were di-

rectors (Cramer being general counsel, and Lambert treasurer) of both companies. The Steamship Company also had an executive committee of three, consisting of Heffernan, Pratt, and Lambert; the latter being a member of the Matthew Addy Company's executive committee also. It had four interlocking directors and four noninterlocking, the latter including Heffernan and Pratt. For the period ending March 31, 1920, the Steamship Company apparently did a very prosperous business, indicating a net profit of at least $60,000.

About July 15, 1920, Heffernan, the Steamship Company's president, and McKittrick, its assistant secretary and treasurer, severed their connection with that company. Pratt was president from about July 15, 1920, until September, 1920, when he left, and was succeeded by L. R. Smith, who had been the Matthew Addy Company's local representative at New York, but seems not to have been an officer of that Company. Hearne, the Matthew Addy Company's representative at Philadelphia, became its vice president. During the fall of that year misfortune overtook the Steamship Company. Apparently shortly before October 1st—after the retirement of Heffernan and Pratt and the succession above stated—about $600,000 worth of the Steamship Company's coal under shipment by rail was attached and tied up by a claimed creditor, whose suit, however, later failed, and to avoid the effect of the attachment the Matthew Addy Company gave to the railroads an indemnity bond of $400,-000; the Steamship Company transferring to the Matthew Addy Company the $900,000 of preferred stock notes and the accompanying collateral stock to secure the indemnity bond, as well as other debts or obligations owing by the Steamship Company to the Matthew Addy Company. The Steamship Company also transferred to the Matthew Addy Company its claim for damages for wrongful attachment.

Also to avoid this attachment, a new corporation, called the Collieries & Commerce Company, was organized under the supervision of Cramer, a director and the general counsel of the Matthew Addy Company; Cramer paying or furnishing the required $3,000 Collieries capital stock. On October 21, 1920, due to the illness of President Smith of the Steamship Company, Cramer was empowered by the board of directors to take executive charge of the corporation, which he did. In November, 1920, the Collieries Company took over the Steamship Company's contracts for the purchase of coal, the Mat-

thew Addy Company lending to the Collieries Company $100,000, which seems to have been afterwards repaid.[2] It also sold to the Collieries Company the 1,000 shares of preferred Steamship Company stock held by the Matthew Addy Company.[3] Due to the collapse of the Steamship Company's export business, caused by the fall of the ocean freight rate from $20 or more per ton to about $5 per ton, its freight charters were canceled in the latter part of November, 1920, with resulting heavy contingent liabilities to the Steamship Company, estimated by L. R. Smith at $1,750,000.[4] The Steamship Company became insolvent as early as October 21, 1920, when the executive charge of its affairs was turned over to Cramer. In the following November the Matthew Addy Company was paid on its $100,000 of preferred stock a semi-annual dividend of 3½ per cent., which had been declared in the preceding July. The other preferred stock holders received no dividends. As already stated, the same were to be credited against preferred stock purchase notes.

During the earlier history of the Steamship Company, and while it was apparently doing a prosperous business, the Matthew Addy Company had stood sponsor, in one form or another, in respect to certain individual transactions of the Steamship Company. It had guaranteed to that company the fulfillment of a coal contract between the Matthew Addy Company and the Virginia, etc., Company, made during the development period of the export branch, and thus previous to the Steamship Company's organization, and which had been turned over by the Matthew Addy Company to the Steamship Company. It also furnished, or became liable for, the freight of a ship contracted for under the development régime previous to the Steamship Company's organization and which also was turned over to that company. The money seems to have been repaid to the Matthew Addy Company. In January, 1920, it guaranteed to the Raleigh Company fulfillment of its contract for the sale of coal to the Steamship Company, which the Raleigh Company was unwilling to make otherwise. In June, 1920, it guaranteed to the Guaranty Trust Company, in New York, payment of the Steamship Company's liability to the extent of $300,000. This guaranty seems likewise to have been made good. We do not find that in these transactions the Matthew Addy Company made any personal profit to itself, except such as it might get as stockholder in the Steamship Company.

[1] It seems clear that the evidence thus far stated did not substantially tend to show that at the time plaintiff's contract with the Steamship Company was made (August 18, 1920) the latter was a mere agent or instrumentality of the Matthew Addy Company, so as automatically to make the latter liable for the contracts of the former. We need refer only to the following decisions of this court: Richmond & I. Construction Co. v. Richmond, etc., Co., 68 F. 105, 108, 15 C. C. A. 289, 34 L. R. A. 625; Pittsburgh & Buffalo Co. v. Duncan, 232 F. 584, 587, 146 C. C. A. 542; N. Y. Trust Co. v. Carpenter, 250 F. 668, 672 et seq., 163 C. C. A. 14, and cases there cited. As said in the Duncan Case (page 587), and quoted in the Carpenter Case (page 673): "The mere fact that the stockholders in two or more corporations are the same, or that one corporation exercises a control over the other through ownership of its stock, or through identity of its stockholders, does not make either the agent of the other, nor does it merge them into one, so as to make a contract of one corporation binding upon the other, where each corporation is separately organized under a distinct charter." We reaffirm the language of this court in the Carpenter Case (page 674): "From an examination of many decisions, we venture to say that no corporation acting within its powers has been held liable for the debts of another corporation legally organized, because it controlled such corporation by reason of ownership of its stock, or otherwise, except by reason of contract or on grounds of agency, or of estoppel, or because the controlled corporation has been used in such a way that the maintenance of its character as a separate and distinct entity would work injustice." This proposition is sustained by numerous carefully considered authorities.

---

[2] Two contracts for export which would otherwise have been carried out were among the rights transferred to the Collieries Company.

[3] Whether the Matthew Addy Company's payment of $100,000 was a loan to enable the Collieries Company to buy the preferred stock referred to does not seem material to our decision. Lambert, however, testifying as a witness for plaintiff, says it was a loan which was repaid December 31, 1920. The preferred stock was, however, worthless at that time, and the Collieries Company note of $100,000 given therefor was never paid.

About January 19, 1921, the Steamship Company's corporate name was changed to the Delaware Steamship & Commerce Company.

[4] A witness for the plaintiff testified that the loading of the Steamship Company's two chartered vessels would cause more than $200,000 loss.

Plaintiff relies strongly upon the decision of this court in Stark Electric Ry. Co. v. McGinty Contracting Co., 238 Fed. 657, 663, 151 C. C. A. 507. We, think the instant case is not ruled by that decision. See the reference to the latter case contained in the opinion in the Carpenter Case, supra, at page 676. In the Stark Case, plaintiff believed in good faith when his written contract was made that it was made directly with defendant.

Plaintiff, however, stresses certain other acts of and dealings between the Matthew Addy Company and the Steamship Company, which it insists tend to show that the latter was merely an agent or instrumentality of the former. We mention several of the more prominent of these items.[5]

From the start the Steamship Company's letter heads bore the name "Matthew Addy Steamship & Commercial Corporation, Incorporated," carried a variation of the familiar Matthew Addy mark, which contained the name "Addy," with mention of its founding in 1859 (the words "Incorporated 1919," apparently referring to the Steamship Company), and referring to branch offices at Cincinnati, Philadelphia, St. Louis, Pittsburgh, Norfolk, and Clarksburg, W. Va., which were branches of the Matthew Addy Company and not of the Steamship Company.

In view of the express reference made to the incorporation of the Steamship Company, the publication on the letter head of the names of that company's officers, some of whom (including President Heffernan and Senior Vice President Pratt) had never been officers of the Matthew Addy Company, we scarcely think the receiver of such stationery likely to be deceived thereby, or to gain any stronger impression than that the new company was affiliated with the Matthew Addy Company, and that that company owned or controlled a majority of the stock, and thus had the power, through such interest, of controlling the Steamship Company.

In December, 1919, during the development of the export branch of the Matthew Addy Company, certain of that company's traveling salesmen, supplied with its cards, called on 50 or 60 different coal companies soliciting coal for export and tidewater trade, stating to those companies that there was in process of organization a company

that the Matthew Addy Company would control, and that they would have an outlet for coal that would prove attractive to the various mines and agencies on which these salesmen called. One of these salesmen testified that to one company (Raleigh Smokeless Fuel) he represented that, "while I could not give them all the details of the company, yet it would be a responsible corporation, and that I somehow or other gathered the impression that it was to be at least a $1,000,000 company, that Matthew Addy had control, and that they need not be worried on the credit feature of it." But it does not affirmatively appear that the salesman was actually so instructed as to the fact, or that he was authorized to make such representations. We think neither of these acts substantially tends to show that the Steamship Company was merely an agent or instrumentality of the Matthew Addy Company, in view of the former's separate incorporation, capitalization, etc.

It also appeared that, pursuant to this visit and solicitation, representatives of the Raleigh Smokeless Fuel Company, on January 9, 1920, went to Cincinnati, and there met certain officers of the Steamship Company including Lambert and the salesman before referred to, as well as General Counsel Cramer and President Green of the Matthew Addy Company; that the latter, before leaving, said that he would stand behind whatever "these gentlemen did"; that (apparently later), upon the statement of the president of the Raleigh Company that they were not satisfied as to the financial responsibility of the Steamship Company, and that, since the contract was to be made with that company, instead of the Matthew Addy Company, they were unwilling to contract without some kind of guaranty, whereupon Lambert, Cramer, and the traveling salesman said that the Steamship Company was organized "as sort of the export department of the Matthew Addy Company, to handle their export business, and they (the Matthew Addy Company) would stand behind it and guarantee its obligations," and that "they said the Matthew Addy Company owned it and controlled it." But not only does the statement so made fall short of asserting the Matthew Addy Company's responsibility for the Steamship Company's contracts without express guaranty—the fact of express guaranty would, we think, rather tend to negative liability without it—but the record does not indicate that plaintiff was advised of the representations made either by the traveling

---

[5] We recognize that in considering the motion for directed verdict we must construe the testimony presented or offered in its aspect most favorable to plaintiff, and thus that the judgment must be reversed if there was substantial and material evidence, given or offered, reasonably tending to sustain plaintiff's theory.

salesman alone or by the Matthew Addy Company's other representatives at the Cincinnati meeting.

Indeed, in June, previous to the making of the contract of August 18, 1920, on which this suit was brought, plaintiff had sold the Steamship Company coal on its own order, which was charged to and paid for by it.[6] Before making the contract plaintiff took pains to inquire as to the Steamship Company's credit, and was referred to the Guaranty Trust Company of New York. Plaintiff was advised by the company, under date of July 31, 1920, that the Steamship Company had "been valued depositors of ours since the early part of this year," and that the Trust Company had accommodated them liberally through their finance department "on a clean credit basis," and that the Trust Company's "relations with them had been both pleasant and satisfactory." The Trust Company added: "We have been told that this concern is a subsidiary of the Matthew Addy Company of Cincinnati, and was organized to take care of the export and shipping business of the parent concern." It was further said that the principals connected appeared to be men of high standing and integrity, and that while in the recent investigation made by the Trust Company it was unable to locate the Steamship Company as making any of its purchases in New York, such reports as it had received had been of a favorable character. The letter further said: "We have their statement as of March 31, 1920, which shows a capital of $1,000,000 with a surplus of $79,000. We might mention, however, that they carry in the asset side of their statement, 'Due from stockholders $910,000.' At that time they had a satisfactory proportion of current assets and current liabilities, having current assets of $151,000 to meet a debt of $600."

Bradstreet, under date of July 19, 1920, advised plaintiff of the incorporation of the Steamship Company in Delaware, about January 1, 1920, with an authorized capital stock of $5,000,000 preferred stock and 50,000 shares no-par common stock, with the statement that "the corporation is understood to be a subsidiary of the Matthew Addy Company, Cincinnati, Ohio, exports coal and pig iron, of which James A. Green is president." After identifying Heffernan and Pratt with their work during the war, the report stated: "The company's *principal business* [7] will, it is understood, be in operating for the Cincinnati Company and is now engaged in transporting coal to Europe in chartered ships, but expects soon to operate its own. Financial details are not obtained, but the company is thought to have the financial backing of the Cincinnati company, which is estimated worth close to $500,000 and its credit is first-class."

Plaintiff admits that it understood from the financial reports referred to that only $100,000 of the preferred stock had been paid in, and that the stockholders had subscribed for, but had not paid, the remaining $900,000. See 2 C. J. 836, § 518.[8]

Shipments under this contract were billed to the Steamship Company, and until November were paid for by it. After November 1st, when the Steamship Company had practically stopped doing business on its own account, the default occurred which resulted in this suit. The Trust Company's report is criticized as not showing the development indebtedness to the Matthew Addy Company of $51,000, which the Steamship Company was to have paid. Whether or not its omission from the Steamship Company's statement to the Trust Company was justified by the testimony that the amount was to be paid only out of profits, and not absolutely, we should not be justified in holding that this omission of itself furnishes substantial evidence that the Steamship Company was the mere agent and instrumentality of the Matthew Addy Company.

The trial judge directed verdict for defendant for the reason that, in his judgment, there was no substantial evidence—nothing more than suggestion or scintilla—sustaining the contention that the contract on which the

---

[6] Against objection, plaintiff's president was allowed to testify that in the offices of the Matthew Addy Company he was told by Robert Green (who was an officer of the Steamship Company) that the latter had been organized as the export agency of the Matthew Addy Company, that it had an authorized capital of $5,000,000 and paid-in capital of $1,000,000, and that the Matthew Addy Company owned more than 50 per cent. of the stock, and that the larger portion of the remainder was owned by officers of the Matthew Addy Company. Green was not an officer or employee of the Matthew Addy Company, and there was no showing that he was authorized to speak for that company.

[7] Italics ours.

[8] Should it be thought that the method of sale of the $900,000 preferred stock is not as compatible with a belief at the time that the stock would finally pay for itself out of profits or dividends as with a contrary belief, we think this circumstance has no substantial tendency to show that the Steamship Company was the mere agent or instrumentality of the Matthew Addy Company.

suit was brought was the obligation of the Matthew Addy Company, as distinguished from the Steamship Company; that the evidence tended only to support the contention that in the organization of the latter company the Matthew Addy Company had in mind "the creation of a truly independent, though called a subsidiary, company," for completely taking over "the part of the business theretofore conducted by the Matthew Addy Company." In so holding the judge distinguished between the original purpose of the Steamship Company's organization and the conduct of the Matthew Addy Company after the failure of the Steamship Company, as to which the court thought plaintiff's remedy to be against the individual officers and directors administering the Steamship Company's affairs while insolvent and the misappropriation of its assets, as the evidence tended to show was done.

The court also found that the evidence of the use by the Steamship Company of the Matthew Addy Company's insignia, the inclusion in the Steamship Company's assets of the $900,000 preferred stock notes, the publication of representations that the same individuals were stockholders of both companies, and that the Steamship Company could therefore be expected to be managed reliably and conservatively, the misstating of assets, the general reputation of standing behind the parties, while susceptible of use as basis of a claim in tort for misrepresentation of credit, and the misleading of individuals to extend a credit to the Steamship Company upon the basis of such reports, were not so used, and in this action at law upon the contract of sale of coal are incidental only to the question whether the contract was that of the Matthew Addy Company, and that, giving due effect to the admitted separate entity of corporations, and the fact that loaning of means of credit of one corporation to another is as compatible with the nonexistence of agency as it is with the existence of agency, and the loaning of money where the officers are largely the same in the two corporations is as compatible with the nonexistence of agency as with its existence, a direction of verdict for defendant necessarily followed.

We think the propriety of the direction of verdict turns upon the validity of the distinction so made between the original object and purpose of the Steamship Company as organized, and (presumably) as operated up to and for a substantial time after the making of plaintiff's contract, and its operation after failure overtook it and after it was taken over bodily by the officers of the Matthew Addy Company, which, the testimony tends to show, used the Steamship Company's assets largely in paying its debts as a preferred creditor—and to the prejudice at least of the Steamship Company's other creditors—as well as the correctness of the conclusion as to the effect of evidence of the nature of that recently stated.

[2] While the case is not free from difficulty, we are disposed to think the reasoning and conclusion of the trial judge sound, and that the connection with and alleged control of the Steamship Company's affairs had by the Matthew Addy Company prior to the time when Cramer took executive charge of the Steamship Company's affairs is not necessarily inconsistent with the existence of the Matthew Addy Company as the parent of and the holder of potential stock control in the Steamship Company, as a separate and distinct corporate and legal entity. In so saying, we do not overlook the use of common suite of offices in New York and of the Steamship Company's desk room in the Matthew Addy Company's Cincinnati office, the asserted writing out by Cramer, counsel for both companies, of the minutes of the Steamship Company's meetings, the asserted keeping of the Steamship Company's books, in part at least, in the Matthew Addy Company's office, the receiving by some of the Steamship Company's officers of so-called instructions from Cramer and Lambert, as well as of other matters which were made the subject of proof. There is, in our opinion, no substantial testimony tending to show that in the operation of the Steamship Company's business—before it was taken over bodily by the Matthew Addy Company—the latter directly profited by its connection therewith, unless prospectively as stockholder.

We think it logically follows from these views that the testimony given or offered to prove the Steamship Company's existence as a mere instrumentality of the Matthew Addy Company, when considered together, is as consistent with a legal status of principalship in the Steamship Company in the making of its contracts as with one of agency for the Matthew Addy Company, at least during the administration of Heffernan and Pratt, and thus for a considerable time after the making of plaintiff's contract. It is difficult to understand how due effect can be given to the separate incorporation, capitalization and organization of the Steamship Company, if such effect can be overcome by testimony of conditions which are as com-

patible with the nonexistence of agency as with its existence. 2 C. J. 933, § 688.

If the views we have expressed are correct, we think it reasonably follows that the testimony, taken together (not all of the details of which are here set out), does not substantially tend to show that the Steamship Company was used by the Matthew Addy Company in such a way that the maintenance of its character as a separate and distinct entity would work legal injustice to plaintiff.

The judgment of the District Court is accordingly affirmed.