**SHEPHERD v. BANKING & TRUST CO. OF JONESBORO et al.**
No. 6924.

Circuit Court of Appeals, Sixth Circuit.
Nov. 12, 1935.

J. R. Simmonds, of Johnson City, Tenn., and H. H. Haynes, Sr., and Robert Burrow, both of Bristol, Tenn. (Simmonds & Bowman, of Johnson City, Tenn., and Burrow & Burrow, of Bristol, Tenn., on the brief), for appellant.

S. C. Williams and J. H. Winston, both of Johnson City, Tenn. (J. A. Susong, of Greeneville, Tenn., and Williams, Miller & Winston, of Johnson City, Tenn., on the brief), for appellee.

Before MOORMAN, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The suit below was on a bill in the nature of a bill to quiet title, brought by the trustee in bankruptcy for the purpose of setting aside a certain trust deed given by stockholders of the bankrupt to guarantee the value and payment of preferred shares in the bankrupt corporation purchased by S. C. Williams and others. The real estate conveyed by the trust deed was at one time the property of the bankrupt, and title thereto came into the possession of the conveying stockholders as a result of the transactions to be presently unfolded.

The Summers-Parrott Hardware Company had been engaged in the wholesale hardware business in Johnson City, Tenn., since 1905. It was a close corporation, with 90 per cent. of its capital stock held by J. A. Summers, its president, J. P. Summers, and H. R. Parrott. About 1909, it appeared desirable to erect a building for the corporation's business on land which it owned. The corporation, however, feared that the execution of mortgages by it would adversely affect its line of credit. Williams, appellee, then a practicing lawyer, though not regularly employed as counsel for the corporation, was consulted, with the result that in 1910 a new corporation styled Buffalo Realty Company was organized, and on June 28th of that year the hardware company conveyed to it its real estate for an ostensible purchase price of $21,312.50, equivalent to its value as carried upon the hardware company's books. It does not appear, however, that the consideration named in the deed was ever paid.

At the same time the hardware corporation desired further capital, and wished to raise it by an issue of preferred stock. Advised that under Tennessee law it could not issue such stock, a new corporation, with the required power, was organized, and the assets of the old company transferred to it. The name of the new company was later changed to Summers Hardware Company. The officers, the stockholders, and their holdings were the same in the new company as in the old. In the organization of the Buffalo Realty Company its stock was subscribed for by the stockholders of the hardware company in proportion to their holdings in the hardware company. In payment of subscription, promissory notes were given but never paid. The hardware company authorized the issue of $100,000 of its own preferred stock, which it unsuccessfully tried to market through a Boston broker. Local investors later took $36,000 of this issue, but in 1912, two years later, $64,000 of the preferred stock was still in the treasury. In the meanwhile the realty company had negotiated loans upon the real estate, and with additional money advanced by the hardware company, had erected the building, at a cost of approximately $70 000. On January 8, 1911, it leased the building to the hardware company for a period of ten years, at a yearly rental of $6,000. Of the amount borrowed for construction by the realty company, $30,000 was represented by bonds secured by a mortgage to trustees in Richmond, Va. The realty company also borrowed from the banks, and it appears that its bank loans were for the most part for the use of the hardware company. With the intercompany transactions, and the activities of either corporation after the organization of the realty company, Williams had no connection in any capacity.

This was the situation when in 1912 Williams and the Brownlow estate, being in funds from the sale of utility interests, were solicited by the hardware company's president to purchase the unsubscribed preferred stock. Williams would purchase no stock unless guaranteed, and the Brownlow estate could not invest in securities unsecured by first mortgage on real estate. Summers then proposed to arrange for a transfer of the realty company's building to the hardware company, and for a mortgage by the hardware company to Williams and the Brownlow estate to secure the stock issue. This proposition, after being taken under advisement, was rejected because of lack of power in the hardware company to mortgage its property to secure its shares. A new arrangement was then proposed, and, as carried out, resulted in the conveyance by the Buffalo Realty Company of its property to Summers, Summers and Parrott as individuals, in consideration of $5 and the assumption by the transferees of the bonded indebtedness thereon. The grantees then executed a deed of trust to the defendant Banking & Trust Company, to secure and guarantee Williams and the Brownlow estate on their purchase of $64,000 of the hardware company's preferred stock. Contemporaneous-

ly there was an agreement that the bonded indebtedness upon the real estate would be retired, so that the trust deed would become a first lien upon the property. Since, however. the money for the retirement of the bonds must come from the hardware company, and since the bonds were not yet due and bore interest at 6 per cent., it was subsequently agreed between Williams and the hardware company that retirement of the bonds could be deferred until Williams should be able to pay the balance of his stock subscription, his initial payment for $32,000 of preferred stock being only $10,000. The Richmond mortgage was later discharged, and so the situation remained until May 29, 1916, when by joint deed of the Buffalo Realty Company and Summers, Summers and Parrott, the property was conveyed to the hardware company for a recited consideration of $5, and the assumption by the vendee of all debts and liens.

The hardware company became insolvent in 1932, and was adjudicated a bankrupt. The trust deed is sought to be 'set aside as void and unenforceable. By counterclaim the trustee under the deed, Williams, and certain transferees and pledgees of some of his original shares, seek foreclosure. The Brownlow estate is no longer interested in the controversy, having given its release in 1922. The decree below was adverse to the plaintiff, and on the counterclaim. We are asked to set it aside.

Many legal contentions are submitted to us in behalf of each litigant. We have given them careful consideration. Our study persuades us that the meritorious question involved, and upon the solution of which decision must rest, involves the status of the Buffalo Realty Company. If effect must be given to its existence as an independent corporate entity, then the decree must stand. If, however, we must ignore its corporate existence on the ground that it was the mere agent or instrumentality of the hardware company, or upon recognized equitable principles, regard the property here involved as in fact the hardware company's property, then the decree must fall, for it is not disputed that a corporation may not in any guise secure by mortgage the redemption of its own capital stock.

This court has upon numerous occasions considered the status of corporations allied to each other either by the control of the stock of one by the other, or by common stock ownership. Richmond & I. Const. Co. v. Richmond, etc., R. Co., 68 F. 105, 108, 34 L. R. A. 625; Pittsburgh & Buffalo Co. v. Duncan, 232 F. 584, 587; New York Trust Co. v. Carpenter, 250 F. 668, 672, 674; Hooper-Mankin Co. v. Matthew Addy Co., 4 F.(2d) 187, 189. The general rule was stated in the Duncan Case and approved in both the Carpenter and Addy Cases, thus: "The mere fact that the stockholders in two or more corporations are the same, or that one corporation exercises a control over the other through ownership of its stock, or through identity of its stockholders, does not make either the agent of the other, nor does it merge them into one, so as to make a contract of one corporation binding upon the other, where each corporation is separately organized under a distinct charter." The exceptions to this general rule are recited in the Carpenter Case and reaffirmed in the Addy Case in the following language: "From an examination of many decisions, we venture to say that no corporation acting within its powers has been held liable for the debts of another corporation legally organized, because it controlled such corporation by reason, of ownership of its stock, or otherwise, except by reason of contract or on grounds of agency, or of estoppel, or because the controlled corporation has been used in such a way that the maintenance of its character as a separate and distinct entity would work injustice." See, also, Martin v. Development Co. of America, 240 F. 42, 45 (C. C. A. 9), where it was said that "a holding corporation has a separate corporate existence, and is to be treated as a separate entity, unless facts are averred which show that such separate corporate existence is a mere sham, or has been used as an instrument for concealing the truth, or where the organization and control are shown to be such as that it is but an instrumentality or adjunct of another corporation."

It is the contention of the appellant that the sequence of events, denominated by it a "cycle," by which the Buffalo Realty Company was brought into being, real estate transferred to it, its conveyance thereafter to stockholders, and its pledge finally to Williams, constituted a unitary plan for accomplishing what the law prohibited, the guaranty by a corporation of its own preferred shares secured by a mortgage on its own real estate. In the alternative it is

argued that even though originally the incorporation of the Buffalo Realty Company, and the transfer to it of real estate, had no sinister purpose, nevertheless the utilization of the corporation subsequently for the same purpose was likewise subject to condemnation.

■■■ We are unable to view the situation in either aspect. If the doctrine which governs the circumstances in which one corporation is to be held the mere instrumentality of another, as announced in the decisions we have noted, is sound, and we are not persuaded that it should be amplified or limited, then it may not be here applied on any principle of agency or estoppel, for there was no holding out of the realty company as the agent of the hardware company, and no express or implied consent on the part of the hardware company to such holding out by the realty company. Nor are we here concerned with creditors of the realty company who dealt with it on the understanding that its acts were the acts of the hardware company, as in the conventional cases, where creditors of an insolvent controlled corporation assert demands against a solvent dominant corporation, Centmont Corporation v. Marsch, 68 F.(2d) 460 (C. C. A. 1), and cases there cited. Nor was the Buffalo Realty Company a mere sham. It was organized for a specific purpose not here or by this plaintiff to be condemned. The corporation law sanctions, and the corporate form permits, a limitation of liability to capital adventured in a given enterprise, and save where specific statutes or some rule of public policy forbids, this instrumentality may be availed of by corporations as by individuals. That credit is sensitive, and that borrowers upon mortgage have a wholesome fear of deficiency decrees, is well recognized, and we may not say that to avoid shaking the one, and safeguard against the other, is not a legitimate exercise of business judgment.

Nor were there here any acts of a surreptitious nature that are the usual badges of fraud. The corporate charter, the several conveyances, and the deed of trust, were all upon the public records, and notice to the world. The appellant must therefore rely not upon any rule of agency or estoppel, but upon the general equitable principle that due effect will not be given to the status of a corporation as an independent entity when it is controlled by another corporation in such a way that the maintenance of its character would work injustice. We have carefully considered the argument advanced on that theory. We are not impressed by it.

The hardware company parted with vacant land worth approximately $21,000. It is true that the consideration was never paid. Equally true it is that the obligation remained, and could have been enforced against the realty company had the hardware company at any time chosen to do so. It is true also that the capital stock of the realty company was paid for by notes instead of cash, but it is equally true that in a proper proceeding the obligation of the realty company's stockholders could have been enforced. The evidence that the stockholders were amply solvent at the time is not controverted. It is true that after the conveyance by the realty company to the individuals no rent was paid by the hardware company for the premises occupied by it. In view of the identity of the stockholders in the two corporations, it was perhaps immaterial to them as to whether rent was paid or not, but in any event this circumstance involved no injustice to the hardware company or its creditors. It is true that there were loans made to each other by the two corporations, and by the hardware company to its stockholders. In the Matthew Addy Case this was not considered a circumstance compelling the court to ignore the distinct corporate form. Finally, the record shows that the hardware company received the property back by conveyance from the realty company and its stockholders at a time when it had a minimum worth of upwards of $100,000, subject only to the lien of the appellees in the sum of $32,000. In the hands of the realty company the property was subject to a trust mortgage for $30,000. This was paid off by the avails of the stock sale, but had there been no transfer to the individual stockholders, and no guaranty by them of the preferred stock, the hardware company on taking title to the property would still have had to liquidate a bonded indebtedness of $30,000. The most that can be said in support of the contention that the hardware company's creditors suffered was that its assets were depleted by the transaction of guaranty to the extent of $2,000. For this, however, the company received an equity in the real estate of upwards of $66,000. That this asset, with others, was dissipated by the later activities of the company that led

ultimately to its insolvency and bankruptcy is not the result of the acts here complained of. There is no such clear showing of injustice as to require that we set aside the general rule that due effect must be given to the separate incorporation of the realty company, and the decree below is affirmed.