**GIDEON–ANDERSON LUMBER CO. v. ST. LOUIS SOUTHWESTERN RY. CO. et al.**
**GIDEON–ANDERSON CO. v. SAME.**

Nos. 10720, 10721.

Circuit Court of Appeals, Eighth Circuit.

Jan. 28, 1937.

Edward A. Haid, of St. Louis, Mo. (Arthur E. Simpson and Jeffries, Simpson & Plummer, all of St. Louis, Mo., on the brief), for appellants.

Jacob M. Lashly, of St. Louis, Mo. (A. H. Kiskaddon, B. F. Batts, Clark M. Clifford, and Lashly, Lashly & Miller, all of St. Louis, Mo., on the brief), for appellees.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

By stipulation of the parties these two cases were tried together in the District Court where a jury was waived. They were consolidated for purpose of appeal with a single bill of exceptions, and having been submitted together here, we shall dispose of them in a single opinion.

The two cases are of the same nature. The appellees, the St. Louis Southwestern Railway Company and its trustee in bankruptcy, brought two actions at law against the appellants, one against the Gideon-Anderson Company and one against the Gideon-Anderson Lumber Company, to recover the difference between the rates paid by appellants and the rates which appellees claimed should have been paid upon certain interstate shipments of lumber over appellees' railroad lines. Upon the conclusion of the trial the court rejected the findings of fact requested by appellants, but made of record findings of fact and conclusions of law upon which separate judgments were entered against appellants and from which these appeals have been taken.

The shipments in regard to which the differences are in dispute consist of 78 car loads of "dressed yellow pine" lumber shipped by appellants over appellees' railroad from points in Arkansas to Gideon, Mo., between April 6, 1932, and March 13, 1935. Thirty-five of such car loads of lumber were consigned to the Gideon-Anderson Company and 43 to the Gideon-Anderson Lumber Company.

Upon certain of the issues the relation of the appellants to each other and the nature of their businesses are material. For many years, the Gideon-Anderson Company had been engaged in the manufacture of lumber and staves at Gideon, Mo., where it operated a saw mill, planing mill, and stave mill. Because of changing conditions in the supply of raw material and because of market opportunities, early in 1932 its officers and directors decided to enter the wholesale lumber business and to manufacture and sell boxes, box shooks, and crating material. To accomplish its purposes, the directors of the company organized and incorporated under the laws of Missouri the appellant Gideon-Anderson Lumber Company. For brevity hereafter, the two appellants will be referred to as the company and the lumber company respectively. The two corporations were managed by the same officers and directors and occupied the same offices. They maintained separate books of accounts, and performed separate functions. The company operated the manufacturing department of the business and the lumber company carried on the lumber business, wholesale and retail, and purchased a part of its raw material for the company and marketed its manufactured products.

During the period in question, the St. Louis Southwestern Railway Company had in effect between the points in Arkansas from which the shipments involved herein were made and Gideon, Mo., two rates for all forest products. The rates upon all of such products which were reshipped over appellees' railroad, or of which the required percentage of the products manufactured therefrom were reshipped, were governed by the railway company's "Local Joint and Proportional Tariffs" numbered 8745A, 8745B, and 8745C. The rates for transportation of such products not reshipped, or of which the required percentage of the products manufactured therefrom were not reshipped over appellees' line, were governed by tariffs numbered 156A and 156B. The rates for products not reshipped over appellees' line were higher than the rates for products manufactured and so reshipped. The lower rates on inbound shipments could be taken advantage of only by shippers who entered into a contract, called a "rough material contract," with the railroad company. The Gideon-Anderson Company entered into such a contract under date of March 17, 1930; but the lumber company at no time had such contract.

The judgment against the company is for the difference between the two rates upon the 35 car loads consigned to it within the period covered by the dispute, and the judgment against the lumber company is for such difference upon the 43 car loads received by it during said period.

The issues upon appeal, based upon appropriate assignments of error, involve the construction to be placed upon the provisions of the railway company's "Local Joint and Proportional Tariff" and the supplements thereto in effect during the period within which the shipments were made. The appellees contend that in order to entitle appellants to the lower rates on inbound interstate shipments:

1. The tariff on "dressed" lumber must be interpreted as requiring the reshipment over appellees' railroad of "sash doors, blinds, wooden boxes, bottle carrying boxes or crates," and that as thus construed both appellants have failed to comply with the provisions of the tariff.

2. The provisions of the tariff specifying reshipment of the "finished product or partially manufactured product" of the inbound shipment (yellow pine) must be construed as requiring an outbound shipment of yellow pine products, and as thus construed both appellants have failed to comply with such provisions.

3. The lumber company cannot in any event avail itself of the lower rates because it failed to execute a written contract with the railway company as required by the provisions of the tariff.

As to the first claim of the appellees, the appellants contend: (a) That the tariff should not be construed so as to require the outbound shipments to consist of "sash doors, blinds, wooden boxes, bottle carrying boxes or crates"; that the expression "dressed lumber" and the word "lumber," as used in the tariff, are both included as rough materials; that "lumber" is a generic term including "dressed lumber," and that when so construed the tariff permits the reshipment for credit of flooring, ceiling, siding, shipping lap, and lath; and (b) that the time within which appellants were required to reship the manufactured products in order to avail themselves of the privileges of the lower rates had not expired at the time of the commencement of these suits.

As to the second claim of the appellees, appellants say (a) that the tariff does not require the reshipment of products manufactured of the same specie of wood as that received, but that substitution of one specie for another is permissible; that the requirements of the tariff are satisfied when the aggregate reshipments of all species is equal to the requisite percentage of all inbound shipments; and that as so construed appellants had complied with the requirements of the tariff; that they had actually reshipped products manufactured of pine; and (c) that the time limit had not expired.

As to the third claim of the appellees, the appellants contend that conceding that the lumber company did not sign a written contract the two companies should be re-garded as one entity in these transactions, and that the lumber company in fact acted as agent for the parent company.

The first two questions in dispute involve the application of the provisions of the proportional tariff to the inbound and outbound shipments. The appellants shipped in to the manufacturing plant at Gideon 78 car loads of "dressed yellow pine lumber" for "manufacture and reshipment." The invoices for outbound shipments during the period made no reference to yellow pine. None were billed as sash doors, blinds, nor box nor bottle carrying crates. Thirty-nine cars were invoiced as "gum crating" and one as box shooks.

The applicable tariff, under the heading General Application of Rates, provides:

"Item No. 1. Rough Forest Products upon which Proportional Rates Apply.

"(a) Rates named in Columns 'A', 'B', and 'C' of Item Nos. 90 and 105, apply on Rough Forest Products listed below * * * subject to conditions and rules provided herein." Among the products listed are "Lumber; Lumber, dressed; Lumber, rough; Lumber, rough green; Lumber, rough oak;" etc.

"Item No. 10. Rules and Regulations.

"Proportional rates named herein are conditioned upon the finished product or partially manufactured product of the Rough Forest Products described in Item No. 1, being reshipped in accordance with the provisions of this tariff * * * within one (1) year * * * after date of original inbound freight bill and may only be used subject to the following conditions: * * *

"(b) When consignees desire to avail themselves of the proportional rates named herein, upon delivery of the inbound rough material or partially manufactured material, contract, (form of which is shown in Item No. 120), must be executed to insure reshipment of the finished product or partially manufactured material in accordance with the provisions of this tariff."

Following the rules and regulations, the tariff sets out schedules showing the proportion of the tonnage of the inbound shipments which must be shipped out to enable shippers to take advantage of the lower rates. The schedule shows that when the product shipped in is "Lumber" the consignee may have credit for shipping out "Box Shooks and Shook Lumber," etc. When "Dressed Lumber" is shipped in, he

may have credit for shipping out "Sash doors, blinds, wooden boxes, bottle carrying boxes or crates."

Upon the first issue the trial court found as a fact that the contents of the 78 cars received by appellants at Gideon, Mo., contained "dressed yellow pine lumber," and that there were no outbound shipments of "sash doors, blinds, flooring, boxes and bottle carrying boxes and crates." Since there was substantial evidence to support these findings, they are conclusive. 28 U. S.C.A. § 773; Davies v. Home Trust Co., 83 F.(2d) 124 (C.C.A. 8); Federal Intermediate Credit Bank v. L'Herisson, 33 F. (2d) 841 (C.C.A. 8).

The trial court also found, as a conclusion of law, that under the language of the tariff, when the inbound product is "dressed lumber," in order for the consignee to avail itself of the proportional rates the outbound products must be, if received for manufacture, only sash doors, blinds, flooring, boxes, and bottle carrying boxes and crates.

In so finding, we think the trial court did not err. The appellants insist that the word "lumber," as used in the tariffs, is a generic term and that it includes the term "dressed lumber." If this construction were sound, it was useless to classify lumber in the proportional tariff as "Lumber, dressed; Lumber, rough," etc., and to set opposite each class, as it appears in the column under inbound shipments, different varieties of manufactured products in the outbound column. Such construction is not reasonable. This point, however, is controlled by the decision of this court in Pillsbury Flour Mills v. Great Northern Ry. Co., 25 F.(2d) 66, and the decision of the Supreme Court in United States v. Gulf Refining Co., 268 U.S. 542, 546, 45 S.Ct. 597, 599, 69 L.Ed. 1082. In these cases it was held that where a commodity shipped is included in more than one tariff designation, that which is more specific will be held applicable. Under that rule it cannot be said that the term "dressed lumber" is not more specific than the term "lumber." It is differentiated for the purpose of giving it a distinct meaning and classification in the proportional tariffs. The fact that the same rates apply under tariffs Nos. 156A and 156B on lumber in its various forms does not require a construction of the proportional tariffs contrary to their obvious meaning.

The trial court also found as a fact that the inbound shipments received by appellees at Gideon, Mo., contained dressed yellow pine lumber and that the outbound shipments checked against such inbound shipments did not contain sufficient yellow pine lumber to entitle appellees to receive the benefit of the proportional rates on the 78 cars carried over the line of the appellants. Since this finding is supported by abundant evidence, it is accepted by us. Davies v. Home Trust Co. (C.C.A. 8) 83 F.(2d) 124, 125.

As a conclusion of law, the court found that under the language of the tariffs in effect substitution of one specie of lumber for another is prohibited, and that inbound shipments of one specie must be offset against outbound shipments of the same specie.

Appellants say that the court erred in his interpretation of the tariffs in this respect, and that substitution of species is permissible; that when the tariffs are so construed appellants shipped out in the aggregate the required percentage of manufactured articles. They contend that for dressed yellow pine lumber shipped in they may offset against it products made of gum, cottonwood, walnut, oak, etc.

A decision of this issue is not essential to a determination of the case. We have already found that the lower court did not err in holding that the appellants did not ship out of Gideon, Mo., any "sash doors, blinds, wooden boxes, bottle carrying boxes or crates," and that such products are required as setoffs against inbound shipments of "dressed" lumber. That being true, the question of whether one specie or another is required under the provisions of the tariffs becomes moot.

Upon the remaining issues, it is necessary to consider the cases of the company and of the lumber company separately.

As to the lumber company, appellees say that in any event it is not entitled to the lower rates because it failed to execute a written contract with the railway company as required by the provisions of the tariff. Appellants admit that such a contract is a condition precedent and that the lumber company did not execute such contract; but, they say, that in handling the lumber shipments here involved the lumber company was merely the agent and creature of and was acting for the company. They insist that the court erred in finding that the company and the lumber

company "are separate corporate entities and under the facts in these cases they cannot, in law, be regarded as one."

Appellants rely upon the decision of this court in Central Republic Bank & Trust Co. v. Caldwell, 58 F.(2d) 721, 734, to support their contention. All that need be said for that case is that this court will not disturb the finding of a lower court based upon conflicting evidence, where the lower court finds that the two corporations involved were not separate and distinct entities. The rule in this court, frequently announced, was there adhered to, that,

" 'Where the court below has considered a question and made a finding on conflicting evidence, its conclusion is presumptively correct, and it should not be disturbed unless it is reasonably clear that a serious mistake has been made in the consideration of the facts or an obvious error has intervened in the application of the law.' Dodge v. Norlin (C.C.A.) 133 F. 363, 371; * * * Houchin Sales Co. v. Angert (C.C.A. 8) 11 F.(2d) 115, 117."

The Caldwell Case, supra, was a proceeding in bankruptcy, and the rule in actions at law, as in the instant case, is still stronger. The rule applicable here was stated by this court in Davies v. Home Trust Co., 83 F.(2d) 124, 125, as follows:

"When an action at law is tried to a federal court without a jury, the findings of the court upon the facts, which may be either general or special, shall have the same effect as the verdict of a jury, and an appellate court will not reverse a judgment for error of fact, such as a finding contrary to the weight of the evidence. 28 U.S.C.A. § 773; Federal Intermediate Credit Bank v. L'Herisson (C.C.A. 8) 33 F.(2d) 841. Such findings when based upon substantial evidence are conclusive, no matter how convincing the argument that upon the evidence the findings should have been different."

■ Here the evidence was conflicting, and the finding of the lower court is conclusive. The lumber company was organized pursuant to a resolution of the stockholders of the company. The two corporations have the same officers, the same board of directors, and their offices are located at the same place. But the company does a manufacturing business solely, while the lumber company is engaged in the wholesale and retail lumber business and markets the products of the company. The lumber company deals in the products of companies other than the company. It has a separate bank account, although the two corporations have a joint account in a different bank. The business of the two corporations was no doubt closely intermingled, but they dealt with strangers as two separate entities, and the lower court was justified in finding that they should be so considered. His conclusion is supported by many authorities. In re Watertown Paper Company (C.C.A. 2) 169 F. 252, 255; Hooper-Mankin Co. v. Matthew Addy Co. (C.C.A. 6) 4 F.(2d) 187; Shepherd v. Banking & Trust Co. (C.C.A. 6) 79 F.(2d) 767; Commerce Trust Co. v. Woodbury (C.C.A. 8) 77 F.(2d) 478, 487; Greenbaum v. Lehrenkrauss Corp. (C.C.A. 2) 73 F. (2d) 285, 286; In re Fox West Coast Theatres (Tally et al. v. Fox Film Corporation et al.), 88 F.(2d) 212 (C.C.A. 9), decided January 13, 1937.

In respect of the company, there remains for consideration the contention of counsel for appellants that the suit is premature. This contention involves the question of whether or not the time limit for reshipping the inbound lumber had expired at the time of the commencement of the suit or of the trial. Upon this point the lower court found as a fact that such time limit had expired, "and any lumber on hand as of June 30, 1935, or as of the date of trial may not be set off against the lumber contained in said 78 cars."

At the request of appellants, the court declared the law to be:

"6. That even though the defendants have not reshipped the amount of tonnage required by the tariff to be reshipped to entitle them to the proportional rates, if they still have a sufficient amount of forest products or manufactured product on hand and the time limit has not expired, plaintiff is not entitled to recover."

■ The law as thus declared is controlling, and the question is narrowed to one of mixed law and fact. The burden was on the appellees to prove either (1) that the time limit for reshipment had expired, or (2) that the company did not have a sufficient amount of the lumber contained in the inbound shipments to offset those shipments. The testimony and the arguments are chiefly directed to the first of these issues. It is assumed in the briefs that if the time limit had not expired the appellants had "sufficient yellow pine in their lumber yards to meet the requisite

outbound percentage to avail themselves of the proportional rates."

■ The determination of whether or not the time limit had expired requires a review of the pertinent provisions of the tariffs. Item 10 of the tariff provides that the proportional rates are conditioned upon reshipment "within one year (except as otherwise provided in item No. 25) after date of original inbound freight bill." Paragraph (a) of item 25 contains the same one year limitation, and paragraph (b) provides:

"(b) In event the shipper, operating under the provisions of this tariff, is unable to forward the required tonnage as provided herein, within the time limit named in paragraph (a) but has on hand sufficient rough forest products or the manufactured product thereof to satisfy tariff requirement as to outbound shipment of all rough forest products forwarded to the mill point under the terms of this tariff, the time limit as provided in paragraph (a), will be extended to 18 months from date of paid freight bill covering inbound movement of rough forest products under the following conditions:

"Shipper desiring such extension must make application to the carrier in writing not less than thirty (30) days prior to the expiration of time limit of freight bills as provided in paragraph (a), on which such extension is desired.

"A certified inventory showing the amount of rough forest products and manufactured product thereof then on hand must accompany such application.

"Upon receipt of application for extension of time limit the carrier's inspector shall verify such inventory and render invalid for reshipment under the terms of this tariff, such freight bills, if any, as are not represented by rough forest products or manufactured product thereof on hand.

"In making such verification the inspector shall include those freight bills upon which the time limit is desired to be extended as well as other freight bills against which the outbound shipments have not been made in accordance with the tariff.

"Freight charges shall be collected on such cancelled freight bills on basis of full local or joint rates applicable to destination of rough forest products in effect on date of inbound movement.

"The time limit on such remaining freight bills as are represented by rough forest products or manufactured products thereof then on hand on basis of ratios provided herein will then be extended to eighteen (18) months from date of such freight bills and the following notations shall be made on all freight bills so extended:

" 'The time limit for reshipment of rough forest products represented by this freight bill is hereby extended to eighteen (18) months, under the terms of paragraph (b), Item No. 25, St. L. S. W. Ry. Tariff No. 8745-B, I. C. C. No. 4676, St. Louis Southwestern Railway of Texas Tariff No. 2915-B.
"[Signed]          "Inspector' —————

"(c) Shipments of outbound tonnage from the second transit point must be made within one year from the date of the paid freight bill covering the inbound movement of rough forest products from the first transit point to the second transit point, except as provided in Note 1."

Of the 35 car loads of dressed pine lumber shipped into Gideon, Mo., and received by the company, the first is dated April 6, 1932, and the last August 24, 1934. Under paragraph (a) of item 25 the time limit upon outbound shipments of the manufactured products is fixed at one year, except as provided in paragraph (b), which provides for a further extension to 18 months "from date of paid freight bill" on condition that the "Shipper desiring such extension must make application to the carrier in writing not less than thirty days prior to the expiration of the time limit of freight bills as provided in paragraph (a)."

Suit was commenced August 15, 1935, and the case was tried December 6, 1935. It is conceded that the time limit of one year had expired upon all the inbound shipments except the last at the time the suit was commenced and as to that shipment the time limit had expired at the time of trial.

The appellants claim, however, that the time limit was automatically extended, notwithstanding no application was made therefor by the company, by reason of certain provisions contained in substituted tariffs and amendments thereto. These changes in the tariffs are as follows:

Effective June 11, 1932, the original tariff was superseded by tariff 8745-B which contained the same provisions with reference to time limits as did the original.

This latter tariff was amended by supplement 3 to which was added notes 1 and 2, providing:

·"Note 1: The time limit of expense bills, which under rules published in paragraphs (a) and (c), expire with and after June 11, 1932, but not later than June 30, 1932, is hereby authorized extended for an additional period of six months, but in no case beyond a maximum period of three years.

"Note 2: The time limit of expense bills, which under rules published in· Paragraphs (a) and (c), and Note 1, expire with and after July 1, 1932, but not later than December 31, 1932, is hereby extended for an additional period of six months, but in no case beyond a maximum period of three years."

Notes 8, 9, 10, and 11, subsequently added, in the same form as note 2, provide for extensions to June 30, 1935. All these notes relied upon by appellants as automatically extending the time limit, it will be observed, are a part of amendment of tariff 8745-B containing item 25 (b) requiring the shipper desiring an extension beyond the one year limit to make application therefor in writing. The question, therefore, is whether the provisions of the notes are to be read in connection with the one year period in item 25 (a) or in connection with the 18 months' extension from the date of the freight bill provided for in item 25 (b). If the extension granted in the notes applies to the one year period, no application for extension was required to give appellants the benefit of the extension provisions. On the other hand, if the extensions granted apply to the 18-month provision, they cannot be taken advantage .of by appellants in the absence of a written application.

We are impressed that reading these notes in connection with item 25 removes all doubt upon this issue. The notes all say, "The time limit of expense bills (freight bills), which under rules published in paragraphs (a) and (c) * * * is hereby extended. * * *" Paragraph (a) provides that; "Shipments of outbound tonnage * * * must be made within one year from the date of paid freight bill covering the inbound movement * * *, except as provided in paragraph (b). * * *" The exception cannot be ignored in reading paragraph (a), and the exception provides for an 18 months' extension ·from the date of the freight bill

on condition that a written application be made therefor. Since the extension granted in the notes is subject to the condition, the appellants having failed to comply with the condition cannot rely upon the notes. It follows that the findings and conclusions of the lower court are correct. Both cases, therefore, must be and they are affirmed.