HOLLANDER et al. v. HENRY, Trustee in Bankruptcy.

No. 139, Docket 21852.

United States Court of Appeals Second Circuit.

Argued Jan. 5, 1951.

Decided Jan. 29, 1951.

Boudin, Cohn & Glickstein, New York City, Daniel W. Meyer, New York City, (Jean Taylor, New York City, of counsel), for appellants.

Allen Murray Myers, New York City, for bankrupt, Belt-Modes, Inc.

Before L. HAND, Chief Judge, and SWAN and AUGUSTUS N. HAND, Circuit Judges.

## L. HAND, Chief Judge.

This is an appeal by fourteen texile workers from an order in bankruptcy, disallowing their claims for wages earned as employees of the bankrupt, Belt-Modes, Inc.; the only question presented is whether they were in fact the bankrupt's employees. The referee, who heard the matter in the first instance, held that they were; but the judge held that they were only employees of another corporation, Danin, Inc. The bankrupt was a corporation, all of whose shares were owned by one, Rubin; it was engaged in the manufacture of belts and pocketbooks; it had no board of directors, and no officers except Rubin, its president, who was concededly in absolute control of it. Those of its employees who worked on belts belonged to a different union from those who worked on pocketbooks; and some time in 1946 Gallack, the "business agent," of the pocketbook workers, told Rubin that "jurisdictional" questions had arisen between the two unions, which had to be settled. Rubin's attorney suggested that Rubin should form a new corporation with a separate factory, where the pocketbook workers should go, and where that part of the business should be carried on; and this was in any event desirable for the added reason that the business had somewhat outgrown the premises, Number One East 33rd Street, Manhattan, where it was being carried on. Gallack agreed and Rubin formed a new corporation, "Danin, Inc.," of which he was the only shareholder, and which, like the bankrupt, had no board of directors, or other officer than him as president. Gallack then executed a collective bargaining contract between the pocketbook union and Rubin, who executed it in the name of Danin, Inc.

The pocketbook business was thereupon transferred to 396 Broadway, Manhattan; Rubin personally lent money to the new corporation to buy new machinery, and added what other machinery was necessary by moving down some of the bankrupt's. The business was conducted in this way for a little less than a year, although the division in manufacture was not absolute, for at times belts were made at Broadway and pocketbooks were made uptown, where, indeed, all pocketbooks were "finished." The bankrupt advanced all the money for the weekly payrolls as they fell due; and, as pocketbooks were completed, they were sent up in batches to 33rd Street, where the bookkeeper estimated what the labor cost upon them had been, added fifteen per cent for good measure, and on its books credited Danin, Inc., with the amounts so found against the debits for the money advanced. Danin, Inc., itself kept a set of books, showing all its transactions with the bankrupt as though it had sold the bankrupt the pocketbooks; it filed its own tax returns, took out Social Security for its employees, Payroll Theft Insurance, Liability Insurance and Workmen's Compensation Insurance. It never had any other assets than the machinery which had been moved from 33rd Street, or which had been bought with Rubin's money, together with the periodic advances to meet its payrolls. At all times the bankrupt's manager employed all workmen, interviewing them at 33rd Street; and, if she engaged them, sending them to Broadway for the foreman to assign them to their specific duties. Early in 1948 Rubin concluded that this arrangement was no longer desirable, and closed up the Broadway factory. He sold some of the machinery, moved back the rest, and resumed making both belts and pocketbooks at 33rd Street. The bookkeeping continued as before, but Danin, Inc., had no longer property of any kind. All the wage claims here

584

in suit arose after this change had been made.

The only question is whether the bankrupt was liable in contract to pay the claimants' wages, and such a liability is not inconsistent with a similar obligation to them of Danin, Inc.: both may have been liable. Since the issue arises in bankruptcy there is some doubt about what law we should look to for its answer: the law of New York where all the transactions occurred, or a "federal common-law," to be ascertained upon the model of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865. There are expressions in recent decisions of the Supreme Court,[1] which, at least when taken out of the context, hold that a bankruptcy court in deciding whether claims against the estate shall be allowed, will not limit itself to their validity judged by the law where they arose. It is not clear whether this goes further than to hold that the bankruptcy court need not give the same effect in distribution to a claim, valid under state law, which that law would give in insolvency—as the concurrent opinion in Vanston Bondholders Protective Committee v. Green, supra, declared—; or whether it means that the bankruptcy court may, and at times must, hold that claims provable against the estate have arisen from transactions out of which the state law would not have raised any claims whatever. Apparently, the Third Circuit has read the decisions in the second sense,[2] and we should have to choose here, provided that the law of New York and the "federal common-law" differed, because the question is whether the transactions created any claims whatever against the bankrupt. We are satisfied, however, that there is no difference between the two laws in this respect. Cardozo, J., in Berkey v. Third Ave. R. Co.,

244 N.Y. 84, 95, 155 N.E. 58, 61, 50 A.L.R. 599, declared that as between parent and subsidiary "Dominion may be so complete, interference so obstrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent"; and even when that is not so, considerations of "honesty and justice" may compel a court to decide the same way. Rapid Transit Subway Construction Co. v. City of N. Y., 259 N.Y. 472, 488, 489, 182 N.E. 145, 150, recognized this is an authoritative exposition of the New York law; and Lehman, J., in his opinion cited two decisions of the Supreme Court,[3] which he thought, as we do, to hold the same doctrine; saying that in these two decisions "the stockholder did not merely use its control of the corporation in the normal and usual manner, but used the corporation as an agent for the transaction of part of the stockholder's business"; and we have ourselves twice in substance applied the same test.[4]

We shall first say what seem to us to be the legal relations between the bankrupt and the claimants, regardless of the negotiations between Rubin and Gallack, which preceded the written contract between the claimants and Danin, Inc. Since neither Danin, Inc., nor the bankrupt had any directors or officers except Rubin, and he was the sole shareholder of each, he was the only individual who could contract for either or commit either to any other obligation or liability. Therefore, if Rubin decided to make a contract on behalf of either corporation, it was in his power to do so; he had only to manifest his intent. He did make the contract with Gallack in the name of Danin, Inc., and the trustee therefore starts with the not implausible argument that Danin, Inc., was the only corporation which Rubin meant

1. Prudence Realization Company v. Geist, 316 U.S. 89, 95, 62 S.Ct. 978, 86 L.Ed. 1293; Heiser v. Woodruff, 327 U.S. 726, 731, 732, 66 S.Ct. 853, 90 L.Ed. 970; Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 162, 163, 67 S.Ct. 237, 91 L.Ed. 162.

2. In re Pittsburgh Railways Co., 155 F.2d 477.

3. Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Association, 247 U.S. 490, 500, 501, 38 S.Ct. 553, 62 L.Ed. 1229; Davis v. Alexander, 269 U.S. 114, 117, 46 S.Ct. 34, 70 L.Ed. 186.

4. Costan v. Manila Electric Co., 2 Cir., 24 F.2d 383; Kingston Dry Dock Co. v. Lake Champlain Transportation Co., 2 Cir., 31 F.2d 265.

to charge. As we have already suggested, it is possible, and we shall indeed assume, that Danin, Inc., became liable to the claimants for their wages; but that does not end the inquiry, because Rubin might have intended also to make the bankrupt liable. In fact he must have so intended, because not to do so would have left the claimants with an employer destitute, or substantially destitute, of any power to perform its engagement; and plainly that would have been a fraud on them. Even while the work was being done on Broadway, Danin, Inc., had no assets except its machinery, and during the period when the wages in suit were being earned—*i. e.* after the Broadway factory had been abandoned—it had no assets at all and was wholly dependent upon the bankrupt. It would be most unfair and unreasonable to impute to Rubin so dishonest an intention, especially when we remember that the result might well have been to expose him to a heavy fine.[5] However, once we assume that he did intend to use his control over the bankrupt to give substance to the formal undertaking of Danin, Inc., the situation becomes precisely parallel to one in which a parent corporation, which has complete control over a subsidiary, assuming to act for it, makes a contract in the subsidiary's name without recourse to the subsidiary's accredited representatives. By so doing the parent makes itself even more completely the responsible actor in the transaction than if it had acted through the subsidiary as an agent, for the subsidiary has had no part whatever in making the contract, having been entirely by-passed. That was the situation at bar.

Furthermore, when we consider the negotiations between Gallack and Rubin that preceded the execution of the contract, this conclusion is confirmed. Gallack, being as we have said the "bargaining agent" of the union, was the agent for the claimants individually; the negotiations make it clear that he and Rubin did not intend the contract to be the measure of the claimants'

remedies. Thus, when Rubin asked Gallack whether he would object if "a different shop" were opened, Gallack answered: "No, we will not object, if you are the same owners and hold all the contracts and the benefits as it is." Again, when Rubin told him that he was organizing Danin, Inc., he said: "We have nothing to do with the new company. Our benefits are the same, Belt-Modes": to which Rubin replied: "It is the same. Just for legal. * * * This has nothing to do with the union." Finally, on cross-examination: "We had the contract straight along with Belt-Modes." "Everything the same as before; just to put down the name Danin for legal purposes." That Rubin also understood the matter in the same way appears from the testimony of Pitkin, one of the foremen in the Broadway factory. When he asked Rubin why the contract was with Danin, Inc., Rubin answered that he should not "worry about it, because" he was "working for Belt-Modes regardless of the agreement." We do not doubt this testimony; we should have to believe that the employees, who for the most part had been theretofore working for the bankrupt, were willing to accept as a substitute a new employer of which they knew nothing and whose existence did not in any important sense change the former conduct of the business; and, indeed, during the period in question did not change it at all. We might perhaps go so far as to hold on this testimony that the written contract of employment between the union and Danin, Inc., was "fictitious and a sham," and that therefore no valid claims would arise under it in the bankruptcy of Danin, Inc., were it bankrupt.[6] So far we need not go, we may assume that it bound Danin, Inc.; all that is important is whether it held the bankrupt too. So to decide does not involve any nice questions of the parol evidence rule. If Gallack and Rubin understood that the bankrupt would secure the wages of the pocketbook workers it was a

5. § 1272, New York Penal Law, McK.Consol.Laws, c. 40.

6. Pepper v. Litton, 308 U.S. 295, 310, 60 S.Ct. 238, 84 L.Ed. 281; New York Trust Co. v. Island Oil & Transport Corp., 2 Cir., 34 F.2d 655; In re Hicks & Son Inc., 2 Cir., 82 F.2d 277; United States v. Rubenstein, 2 Cir., 151 F.2d 915, 919.

valid contract; the same labor was a good consideration for the two promises. Nor was there in such a bargain the slightest injustice to the bankrupt's other creditors, as the trustee suggests. During the period in question—after the pocketbook business had been moved back to 33rd Street—there was nothing to indicate that it was being carried on separately from the belt business. No creditor has appeared to say that he gave credit to the bankrupt in reliance upon the apparent separation of the business while the Broadway factory was in operation; and we need not say whether upon such proof he would establish a priority over the claimants. As the evidence stands, the bankrupt's creditors took their chances of its credit as unsecured creditors always do; this was not the case of a secret lien upon property pledged or sold to another.

Order reversed; cause remanded for further proceedings in accordance with the foregoing opinion.