282 F.2d 231
 Carl FISSER and Martha Fisser, co-partners doing business
under the firm name and style of Fisser &
v.
Doornum, Libelants-Appellants, v. INTERNATIONAL BANK,
Respondent-Appellee.
 No. 274, Docket 25914.
 United States Court of Appeals Second Circuit.
 Argued April 5, 1960.
Decided Aug. 1, 1960.
 
 George L. Varian, of Crowell, Rouse & Varian, New York, City, for libelants-appellants.
 Emanuel Becker, of Becker & Martin, New York City, for respondent-appellee.
 Before LUMBARD, Chief Judge, and HINCKS and FRIENDLY, Circuit Judges.
 HINCKS, Circuit Judge.
 
 
 1
 The immediate issue for decision is whether the respondent-appellee, International Bank, may be directed to submit to arbitration the determination and measure of any liability it may owe to libelants-appellants,[1] German coal importers, /2/ by reason of the conceded breach of a written contract of affreightment signed solely by the libelants and Allied Transportaion Corporation, a Liberian corporation which libelants charge was the alter ego of the respondent. The court below answered this question in the negative. It reasoned that whatever liability might ultimately attach to the respondent growing out of the contract default of Allied, its alleged instrumentality or adjunct, the respondent could not be compelled to arbitrate the issue of its liability or the measure thereof because it had not signed the formal charter-party and hence as to it there was no'written provision' for arbitration within the meaning of the Federal Arbitration Act of 1952, 9 U.S.C. 1-14. Accordingly, the court dismissed the libel with its accompanying petition for the enforcement of arbitration.
 
 
 2
 It is true that under the Act, a 'written provision in any maritime transaction * * * to settle by arbitration a controversy thereafter arising out of such * * * transaction' is the sine qua non of an enforceable arbitration agreement. 9 U.S.C. 2, 4. It does not follow, however, that under the Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision.[3] For the Act contains no built-in Statute of Frauds provision[4] but merely requires that the arbitration provision itself be in writing. Ordinary contract principles determine who is bound by such written provisions[5] and of course parties can become contractually bound absent their signatures. It is not surprising then to find a long series of decisions which recognize that the variety of ways in which a party may become bound by a written arbitration provision is limited only by generally operative principles of contract law.[6]
 
 
 3
 The charter-party here under consideration clearly contains a written provision in which it is agreed that a controversy such as that now presented shall be submitted to arbitration,[7] and the sole issue for determination is whether the respondent, as well as the formal signatories to the charter-party, is bound by the arbitration provision. Libelants argue that if in fact Allied was the respondent's mere alter ego, making this a proper case to pierce the corporate veil of Allied and to hold those controlling it as one with it, then consistency and the alter ego doctrine itself require that the respondent be obligated not only to respond in damages for Allied's breach of contract but to specifically perform Allied's other contractual obligations, including that of arbitration.
 
 
 4
 We agree. While we discover no authority on this precise point, it is clear that the consequence of applying the alter ego doctrine is that the corporation and those who have controlled it without regard to its separate entity are treated as but one entity, and at least in the area of contracts, the acts of one are the acts of all. Weisser v. Mursam Shoe Corporation, supra; Shamrock Oil and Gas Co. v. Ethridge, D.C.Colo., 159 F.Supp. 693; Chilean Nitrate Sales Corp. v. The Nortuna, supra; Powell, Parent and Subsidiary Corporations, Chpt. I. There is no reasonable basis for distinguishing between the parent's obligation to respond in damages for its instrumentality's breach of contract and its obligation to arbitrate the measure of those damages. In neither instance does the parent consent to a contractual obligation; to the contrary it carefully aboids any such agreement, express or implied in fact. Farm Security Administration, Department of Agriculture v. Herren, 8 Cir., 165 F.2d 554.
 
 
 5
 We have heretofore held that the obligation to respond in damages arises from a contract to which the alter ego theory binds that parent which as 'puppeteer' has 'directed his marionnette' to sign. Weisser v. Mursam Shoe Corporation, supra. We hold now that if the parent is bound to the contract then like its marionette it is bound to submit to arbitration.[8] It follows that the judge erred in ruling that the respondent was not bound by the arbitration clause merely because it had not signed the charter. The respondent's amenability to arbitration could be solved only by determining whether Allied in entering into the charter did so as the respondent's alter ego.[9] The judge below thought it unnecessary to deal with that issue and so did not attempt to make comprehensive findings of the facts upon which it depends. We must, therefore, turn to the evidence and make our own findings.
 
 
 6
 We find the facts to have been as follows. On October 24, 1955 Mr. Lawn, who stated he represented a financial group, requested Phs. van Ommeren Shipping (U.S.A.), Inc., a firm of maritime brokers, to negotiate for ship charters and maritime contracts of affreightment. On that occasion and at later meetings on October 27 and 31 Lawn received general information about the incidents of such business from Mr. Solleveld and Mr. Vincent, the president and vice-president, respectively, of van Ommeren. At the latter meeting van Ommeren's representatives insisted that they could proceed no further with such business until authorized by a principal with a satisfactory credit rating. Lawn disclosed the respondent as principal, stating that it would operate through a Liberian company. On November 3 Lawn presented as evidence of his authority a letter dated November 2 from the respondent signed by Vreeland, its president. The letter stated, in part:
 
 
 7
 'We have in principle accepted a proposal to finance and conduct a shipping business which includes time chartering two Liberty dry cargo type ships to carry cargo generally between Mexico, the United States and certain foreign countries.
 
 
 8
 'The business would be operated through a corporation to be formed by us and to which we would supply the financial resources.
 
 
 9
 'We advise you of the foregoing so that the initiation of contracts may be expedited pending prompt formalization of the necessary corporate and financial arrangements. * * *'
 
 
 10
 The letter also referred van Ommeren to respondent's correspondent banks and listed respondent's officers and directors and their business connections. Prior thereto the respondent had been engaged in the business of financing ventures but never in operating ventures.
 
 
 11
 Thereafter, van Ommeren canvassed the market to discover available ships and cargoes. It secured an offer on two ships and so advised respondent by letter dated November 9 in which it requested authorization to negotiate and finalize the charters. No response was forthcoming until November 16 when Vreeland accompanied by Lawn and a Mr. Simonson discussed the project thoroughly with the van Ommeren representatives who told him that $100,000 to $150,000 would be necessary to start the venture. Vreeland gave van Ommeren authority to bid for charters on the two vessels and to continue negotiations on an available coal contract which van Ommeren had discovered. Also, Vreeland concededly told van Ommeren that the respondent would neither appear on nor guarantee the coal contract; that the contract would be performed by a Liberian corporation to be created for that purpose.
 
 
 12
 At this point, a conflict of testimony developed. Solleveld and Vincent testified that Vreeland's explanation to them for operating through a foreign subsidiary was to avoid the payment of United States income taxes; this explanation they accepted since such was common procedure for shipping ventures. These van Ommeren officers also testified that Vreeland assured them the respondent would furnish Allied with all necessary financial resources and that as responsible principal it would stand behind the performance of the operating company which it had nominated. There was, however, no evidence that these representations to van Ommeren were passed along to the libelants. And that such representations had been made was denied in Vreeland's testimony. He testified that the respondent's sole interest in the maritime venture, either expressed or otherwise, was the making of a secured loan to Allied. In his testimony he characterized as 'unfortunate' his language in the November 2 letter stating that respondent was 'prepared to conduct a shipping business.'
 
 
 13
 Whatever representations were in fact made to van Ommeren that firm successfully negotiated by Nomveber 28 a three-year coal contract with the libelants which was to commence April 1, 1957. In the course of these negotiations van Ommeren informed libelants that it was acting on behalf of Allied, a company 'nominated and controlled by International Bank who will not appear in Charter Party'; that the respondent had numerous companies available for a variety of purposes. Teh libelants informed van Ommeren that they had been unable to obtain a financial report on Allied and therefore requested a more detailed report on the respondent. In response van Ommeren forwarded a list of the respondent's officers and directors and their business connections. Neither van Ommeren nor the respondent ever made additional representations to the libelants relative to the relationship between Allied and the respondent.
 
 
 14
 At a conference on November 28, in response to Vincent's request for formal authorization to confirm the coal contract, Vreeland orally replied: 'I give you that authority.' (Now on appeal it is sharply disputed whether he gave this authority on behalf of respondent, as its president, or on behalf of Allied, as its president.) On that same day van Ommeren confirmed the contract with the libelants and simulataneously sent a letter to the respondent, attention Vreeland, in part as follows:
 
 
 15
 'We have pleasure in confirming herewith the fixture, made with your authority on behalf of Allied * * * which Corporation is understood to be controlled by you, as Owners and/or Charter Owners and/or Disponent Owners, with * * *.'
 
 
 16
 Vreeland acknowledged this letter in a letter of his own which was both written on respondent's letterhead and signed by Vreeland, as its president. He therein informed van Ommeren that a Mr. Becker had been retained by Allied to supervise its shipping activities. The letter stated, in part:
 
 
 17
 'From time to time Mr. Becker will be in touch with you regarding the operations of Allied Transportation Corporation which will be under your management and we want you to know that he is authorized to discuss with you all and any matters pertaining to these operations. We also authorize you to turn over to Mr. Becker, upon his request, any reports, contracts or other documents which concern such operations.'
 
 
 18
 On December 21, the contract was formally approved by Allied's directors and on December 28, Vreeland signed the formal contract in the name of Allied after it had been carefully scrutinized by the respondent's attorneys. It was subsequently signed by the libelants. Allied completely breached the contract: it took no steps by way of performance. Indeed, it was wholly without financial ability to perform, never having had capital in excess of the $500 paid by Simonson for one half of the capital stock, as will presently appear.
 
 
 19
 The relationship between the respondent, Allied, Simonson and Lawn was in fact as follows. The latter two men first became associated with the respondent in connection with the shipping venture. It was agreed that they were to act as Allied's managers in developing cargo contracts. Vreeland testified that the respondent agreed only to finance Allied through a secured loan but Lawn testified that at some time prior to November 16 it was agreed that respondent would own 50% Of Allied's stock and that the remaining 50% Would belong to Simonson but would be held by respondent as collateral until the operation resulted in a profit sufficient to repay $100,000 of the $150,000 loan which respondent agreed to advance Allied.
 
 
 20
 Meanwhile, Allied had been organized by one of respondent's subsidiaries on November 18. At that time the organization dummies executed proxies, two of which ran to Vreeland and one to Simonson who was not connected with the respondent. The subscriptions of the three dummies to one share each were assigned to respondent but no certificates of stock were then or thereafter ever issued. At the first stockholders' meeting on December 21, Vreeland, Simonson and Meyer, who was respondent's treasurer, were elected directors together with a lawyer, Wasson, who had previously represented certain of respondent's subsidiaries. These four men were also elected president, vice-president, treasurer and secretary, respectively. At the first directors' meeting it was voted that checks signed by the president or treasurer (who held corresponding offices in the respondent) must also be signed by Simonson, vice-president, or Lawn, agent (neither of who was an officer or employee of the respondent). At the trial, none of these mem could say who had paid Allied's organization fees and the cost of such items as its minute book and stock ledgers.
 
 
 21
 On December 28, Allied, Simonson and respondent[10] entered into a written agreement defining their relations. Under this agreement, Simonson agreed to purchase the 500 authorized shares of Allied's common stock at $1 per share. These shares were to be issued to respondent, however, and it was to have full voting power until such time as Allied repaid respondent's $100,000 loan. Allied agreed to repay the loan not later than February 1, 1957 and respondent on its part agreed to purchase or secure a purchaser for $50,000 of convertible preferred stock and to vote to retain Simonson as a member of the board and as vice-president as long as it remained holder of record of Simonson's shares.
 
 
 22
 Thereafter, Vreeland made contact with Gevers, an officer of the Bankers Trust Company, and inquired into the possibility of discounting Allied's $100,000 note if it were endorsed by respondent. Gevers testified that Vreeland stated that respondent planned to enter the shipping field for which purpose it had created Allied. Vreeland in his testimony categorically denied making such a statement. It is agreed, however, that Bankers Trust Company consented to the proposed loan. Shortly thereafter the loan request was withdrawn and Allied never received any funds. For unexplained reasons respondent never purchased Allied's convertible preferred stock and Meyer never deposited Simonson's $500 check in payment for the common stock. Nor did respondent ever loan Allied any money. Vreeland testified that it was the respondent's intention to make the loan only if Allied could carry out the business it had undertaken and this became impossbile because Allied could not procure ships.
 
 
 23
 The foregoing facts, we hold, do not justify disregard of Allied's separate existence. An examination of all the cases which the parties cite and of many others dealing with this problem has left us with the conviction that nowhere is there a better statement of the generally applicable principles than that found in Lowendahl v. Baltimore & Ohio R.R. Co., 247 App.Div. 144, 287 N.Y.S. 62, affirmed 272 N.Y. 360, 6 N.E.2d 56. There, borrowing heavily from a leading text on this subject,[11] the court said:
 
 
 24
 'Restating the instrumentality rule, we may say that in any case, except express agency, estoppel, or direct tort, three elements must be proved:
 
 
 25
 '(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
 
 
 26
 '(2) Such control must have been used by the defendant to commit fraud or worse, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
 
 
 27
 '(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.' (247 App.Div. 144, 287 N.Y.S. 76.)
 
 
 28
 We incline to think that the libelants have failed to prove such control over Allied by the respondent as to bring its case within the first requirement of the rule as above-stated. For aught that appears, Vreeland in authorizing van Ommeren to confirm the contract may have been acting as Allied's president-- not as an executive of the respondent. Likewise, as to the arrangements for the loan from the Bankers Trust Company, and the subsequent withdrawal of the request therefor; also the arrangements whereby Becker was employed to supervise Allied's activity.
 
 
 29
 The proofs do not show that in doing these things, or others transpiring subsequent to Allied's organization, executives of the respondent were directly meddling with the management of Allied's affairs: it is equally plausible to ascribe the acts to the same individuals as Allied's executives participating in a manner normal and usual for stockholders and directors of an independent corporation. /12/ It would, of course, be a complete disregard of the basic structure of corporation law to hold that Allied, merely because it elected the respondent's officers to be its officers, forfeited its entity and deprived its parentstockholder of immunity from liability for its contracts.[13]
 
 
 30
 Moreover, there were outsiders on Allied's Board of Directors whose signature was required on checks signed by Vreeland and Meyer (officers of both Allied and the respondent) and who had demonstrated their independence by obtaining an arms-length contract with the respondent for Allied's financial requirements. These same outsiders were to be active in the management of Allied and it might well be said that they were the real entrepreneurs in the entire venture. Lowendahl v. Baltimore & Ohio R.R. Co., supra.[14] The proofs as to control on which the libelants rely, including the testimony of van Ommeren's officers as to statements made to them by Vreeland,[15] are fairly ascribable to the ordinary and temporary control over an incipient corporation by its incorporators. Such proofs, in our opinion, are not enough to demonstrate that Allied, subsequent to its organization, lacked an independent entity.
 
 
 31
 But even if on the issue of control the preponderance of the evidence favored the libelants, it is altogether plain that the second stated element of the rule has not been proved. There is no evidence that all the statements allegedly made by Vreeland to van Ommeren's officers had been passed along to libelants: they had been told only that the negotiations were 'on behalf of Allied, a compnay nominated and controlled by International Bank who will not appear in the charter party.' Surely there was no fraud in this representation, nor did it indicate an identity between respondent and Allied which now justifies a piercing of Allied's corporate veil.[16] It was foursquare with the truth: it misled the libelants not a whit. The caution that the respondent 'will not appear' apparently led them to make inquires as to Allied's financial standing. However, when their inquiries turned up no information as to Allied-- a fact which of itself might have been expected to put them on their guard-- they made no demand on the respondent for a guarantee or other assurance. Nor did they inquire whether Allied even had the necessary ship-charters for performance. These omissions are perhaps of more significance in view of the earlier efforts in behalf of Allied or the respondent to obtain a guarantee from the libelants. The contract reserved to the libelants a right to cancel if at any time the German government prohibited the importation of American coal. It is plausible to ascribe to this provision, or perhaps to the favorable freight rate, the libelants' readiness to deal with the subsidiary: they may well have felt that a thoroughly responsible principal such as the respondent could not be found which would accept such unfavorable terms. Even if the libelants on the strength of the representation believed that the respondent, because it 'nominated and controlled,' would be liable, its belief was not the product of the respondent's wrongdoing. We may not strip Allied of its separate entity merely because of the libelants' naivete nor because it is now dissatisfied with the bargain it made. New York Trust Co. v. Carpenter, 6 Cir., 250 F. 668; Texas Co. of Mexico S.A. v. Roos, 5 Cir., 43 F.2d 1; North v. Higbee Co., 131 Ohio St. 507, 3 N.E.2d 391; Hanson v. Bradley, 298 Mass. 371, 10 N.E.2d 259; Hooper-Mankin Co. v. Matthew Addy Co., 6 Cir., 4 F.2d 187. Certainly the respondent did not use its control over Allied to perpetrate the violation of any duty, statutory or otherwise, or any act, unjust or otherwise, in contravention of the libelants' legal rights.[17]
 
 
 32
 The libelants make much of the fact that to carry out the contract Allied was grossly undercapitalized and claims this fact as a sufficient reason to pierce its corporate veil. There may be situations in which the launching of a subsidiary corporation upon the stream of commerce with capital grossly inadequate for its expected activities will be indicative of lack of an independent entity. However that may be, we are pointed to no authorities which justify a disregard of a corporation's separate existence merely because of its undercapitalization when its controlling stockholder has at least regarded the formalities of such existence. In Stark Electric R. Co. v. McGinty Contracting Co., supra, undercapitalization was not the only pertinent factor; the subsidiary was also represented as being one with the parent. And in Luckenbach S.S. Co. v. W. R. Grace & Co., 4 Cir., 267 F. 676, while the subsidiary's disproportionate lack of capital was noted, there was also present the additional element of unconscionably holding the subsidiary out as the apparent owner of valuable assets.[18]
 
 
 33
 In any event, this record affords no factual basis for such a claim. For aught that appears, the respondent and its associates, who were concededly unfamiliar with shipping ventures, were not unreasonable in their relinance on the predictions of experts that Allied would need no more than $150,000 to successfully handle those operating expenses which would be incurred during the several months before monies would come due on the coal contract. While it is true that the respondent agreed to furnish $100,000 of this sum through a loan rather than as a capital contribution, it also agreed to furnish an additional $50,000 through the purchase of preferred stock. We cannot say that with these funds Allied would have been undercapitalized-- still less that its undercapitalization would have been so gross as to be a badge of fraud or wrong. At most, this was a case of inadequate capitalization, the risk of which under the normal rule the corporate creditors must bear.
 
 
 34
 Finally, even if we were to assume, as libelants would have us do, that respondent by failing to furnish Allied with the promised capital and loans thereby breached some duty owed to libelants, it is not proved that the libelants' loss was proximately caused thereby. Thus the third element of the above-stated rule is absent.[19] In fact, the sole explanation for Allied's failure to carry out the coal contract was its inability to charter vessels. And there is nothing to show that this inability was due to a failure of respondent's loan and capital commitments. Such evidence as there is flows in the opposite direction: it suggests that the respondent did not go through with the proposed loan to Allied because even with the loan ship charters could not be obtained. For owners having ships for hire demanded bankable charters which in turn depended upon the guaranty of a responsible United States corporation. This was an obvious risk inherent in dealing with a foreign subsidiary of a United States corporation and one which libelants cannot now claim was in any way caused by the wrongful control of an undercapitalized foreign subsidairy. The language of Judge Learned Hand is here appropriate. 'The libelant has been disappointed, not in failing to get the promise which it supposed, but in its performance, a risk inherent in any contract.' Kingston Dry Dock Co. v. Lake Champlain Transportation Co., 2 Cir., 31 F.2d 265, at p. 267.
 
 
 35
 And so, not because the contract had not been signed by the respondent but because the libelants failed to prove that Allied was the respondent's alter ego,
 
 
 36
 The judgment below is affirmed.
 
 
 
 [1]
 Throughout this opinion we will refer to the parties by their relation to the controversy below
 
 
 [2]
 The libel was filed by Fisser & v. Doornum, a German partnership engaged in the import and wholesale coal business and as shipowners and brokers, on its own behalf as the chartering broker and on behalf of certain named German entities. Judge Palmieri in an earlier opinion ruled that the libel was properly brought by the libelants on their behalf and for the benefit of their named principals. 164 F.Supp. 826
 
 
 [3]
 Even assuming, arguendo, that a party can bind himself to a 'written provision' for arbitration only by signing such a provision, still, based upon ample authority in related fields, this would be no obstacle to imputing to a controlling parent its instrumentaility's contractual obligation to arbitrate. Thus we noted in Weisser v. Mursam Shoe Corporation, 2 Cir., 127 F.2d 344, 145 A.L.R. 467, that the better reasoned authorities do not allow a defendant to abuse the privilege of stockholder-immunity by invoking the Statute of Frauds or the sealed instrument rule where its instrumentality, at least, has signed the necessary instrument. See Powell, Parent and Subsidiary Corporations, Chpt. V. and VIII
 
 
 [4]
 Compare 1449 of the New York Civil Practice Act which states that 'every submission to arbitrate an existing controversy is void, unless it or some note or memorandum thereof be in writing and subscribed by the party to be charged therewith or by his lawful agent.' This provision obviously conditions the enforceability of a submission to arbitrate an existing controversy upon the signature of the party to be charged. Bellmore Dress Co. v. Tanbro Fabrics Corp., Sup., 115 N.Y.S.2d 11; In re Exeter Mfg. Co., 254 App.Div. 496, 5 N.Y.S.2d 438. These same authorities hold, however, that under another portion of 1449, which like the Federal Arbitration Act provides that '(a) contract to arbitrate a controversy thereafter arising between the parties must be in writing,' the liability of a party is determined by the ordinary principles of the law of contracts
 
 
 [5]
 American Airlines, Inc. v. Louisville & Jefferson C.A.B., 6 Cir., 269 F.2d 811; Kulukundis Shipping Co. v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978; Goldhill Trading & Ship. Co., etc. v. Caribbean Ship. Co., D.C.S.D.N.Y., 56 F.Supp. 31; cf. Corbin on Contracts, Vol. 6, 1444A
 
 
 [6]
 Thus assignees of contracts containing arbitration provisions may become parties to such provisions, Application of Reconstruction Finance Corp., D.C.S.D.N.Y., 106 F.Supp. 358 (and cases cited therein); Instituto Cubano v. The M. V. Driller, D.C.S.D.N.Y., 148 F.Supp. 739; Corbin on contracts, Vol. 4, 892. The same result is reached under the New York Act, Matter of Lippman v. Haeuser Shell Co., 289 N.Y. 76, 43 N.E.2d 817, 142 A.L.R. 1088. Similarly, an optionee by exercising an option may create a mutually binding contract to arbitrate, Calvine Mills, Inc. v. L. A. Slesinger Inc., 2 Cir., 258 F.2d 288. When a party is added to a contract by novation he can enforce an arbitration provision therein even though he is not a signatory to the contract. And enforcement can be had against another nonsignatory who it merely the instrumentality of a party bound by the arbitration clause. Chilean Nitrate Sales Corp. v. The nortuna, D.C.S.D.N.Y., 128 F.Supp. 938. Also, a corporate beneficiary may enforce an arbitration provision which was executed when it was still inchoate. Application of Jacoby, Sup.Ct.N.Y.Co., N.Y.Co., 33 N.Y.S.2d 621. See also Parry v. Bache, 5 Cir., 125 F.2d 493; In re Exeter Mfg. Co., supra; and Bellemore Dress Co. v. Tanbro Fabrics Corp., supra, for other illustrations of parties being contractually bound to written arbitration provisions absent their signatories to such agreements
 
 
 [7]
 Section 3 of the charter-party provided: '* * * If any dispute or difference should arise under this Charter, same to be referred to three parties in the City of New York, one to be appointed by eac h of the parties hereto, the third by the two so chosen, and their decision, or that of any two of them, shall be final and binding, and this agreement may, for enforcing the same, be made a rule of Court. Said three parties to be commercial men.'
 It is no longer open to serious question that, even if damages are the sole issue for arbitration, that issue is within a clause of general arbitration and under the Federal Arbitration Act the clause will be specifically enforced against all those bound by it. Shanferoke Coal & Supply Corp. v. Westchester Service Corp., 2 Cir., 70 F.2d 297, affirmed 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583; Kulukundis Shipping Co. v. Amtorg Trading Corp., supra.
 
 
 [8]
 The libelants relied below upon Lehman v. Ostrovsky, 264 N.Y. 130, 190 N.E. 208; In re Bond and Mortgage Guarantee Co., 288 N.Y. 270, 42 N.E.2d 38; and General Commodities Corp. v. Hyman-Michaels Co., 9 Cir., 224 F.2d 952. But these cases are plainly distinguishable from that now before us. More directly in point and in accord with our conclusion is Judge Dawson's opinion in Chilean Nitrate Sales Corp. v. The Nortuna, supra
 
 
 [9]
 The libelants do not claim that Allied in signing the charter was the respondent's authorized agent
 
 
 [10]
 In this, the respondent acted through the International Bank of Washington, a New York corporation wholly owned by it, to which it had transferred the operation of its foreign department
 
 
 [11]
 Powell, Parent and Subsidiary Corporations (1931), pp. 4-6
 
 
 [12]
 See Consolidated Rock Rpoducts Co. v. Du Bois, 312 U.S. 510, 523-524, 61 S.Ct. 675, 85 L.Ed. 982; United States v. Reading Co., 253 U.S. 26, 62, 40 S.Ct. 425, 64 L.Ed. 760; Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 2 Cir., 31 F.2d 265 (and cases cited therein); Hollander v. Henry, 2 Cir., 186 F.2d 582; Costan v. Manila Electric Co., 2 Cir., 24 F.2d 383; Centmong Corporation v. Marsch, 1 Cir., 68 F.2d 460; Hooper-Mankin Co. v. Matthew Addy Co., 6 Cir., 4 F.2d 187; Fish v. East, 10 Cir., 114 F.2d 177
 
 
 [13]
 See Taylor v. Standard Gas & Electric Co., 10 Cir., 96 F.2d 693, and the many cases cited therein, reversed on other grounds, 306 U.S. 307; Hooper-Mankin Co. v. Matthew Addy Co., supra; Garden City Co. v. Burden, 10 Cir., 186 F.2d 651; Powell, fn. 11, supra, at p. 10; Fletcher, Cyclopedea of Private Corporations, 43 at pp. 158-159
 
 
 [14]
 We note also the probability that respondent, as contrasted with Allied, had no power to carry on a shipping venture, i.e., that the held corporation had power to engagein activities without the scope of those authorized for the parent. This is a factor of considerable weight against a piercing of Allied's corporate veil. Fletcher, fn. 13, supra, at 43, fn. 76
 
 
 [15]
 Although these statements were denied by Vreeland, for purposes of this opinion we take them as true
 
 
 [16]
 This representation differed vitally from those in such cases as Weisser v. Mursam Shoe Corporation, supra; Hollander v. Henry, supra; Stark Electric R. Co. v. McGinty Contracting Co., 6 Cir., 238 F. 657
 
 
 [17]
 See, e.g., Anderson v. Abbott, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793; Weisser v. Mursam Shoe Corporation, supra; United States v. Morris & Essex R. Co., 2 Cir., 135 F.2d 711; Majestic Co. v. Orpheum Circuit, 8 Cir., 21 F.2d 720 (and many cases cited therein); Texas Co. of Mexico S.A. v. Roos, supra; New York Trust Co. v. Carpenter, supra; Bartle v. Home Owners Cooperative, 309 N.Y. 103, 127 N.E.2d 832; North v. Higbee Co., supra; United States v. Islip Machine Works, Inc., D.C.E.D.N.Y., 179 F.Supp. 585, Powell, fn. 11, supra, Chpt. III
 
 
 [18]
 This fact has led one commentator to classify this case as one growing out of estoppel, and it is of some interest that this same commentator makes no separate classificationof mere undercapitalization as an actionable wrong, although he does list it as one persuasive, though not controlling, circumstance indicating improper control over a mere instumentality. Powell, fn. 11, supra, at pp. 14 and 66. Compare Note, 71 Harv.L.Rev. 1122, 1132-1133
 
 
 [19]
 See Majestic Co. v. Orpheum Circuit, fn. 17, supra; North v. Higbee Co., supra; Hanson v. Bradley, supra; cf. Powell, fn. 11, supra, Chpt. IV