[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
In this case the court must decide whether all counts of the plaintiff's complaint should remain as a viable suit or whether the first three counts should be severed and sent to arbitration as sought by certain defendants. Reference to the pleadings places the matter into proper perspective. The amended complaint is in five counts.[1] The first three counts are directed to the defendants, Merrill Lynch Co., Merrill Lynch Asset Management, Inc. (MLAM), Merrill Lynch, Pierce, Ferrer Smith (MLPF S), CT Page 10580 Frederick M. Genung and Edmund C. Hyland. Count 4 concerns the defendants, James Cahill and Colonial Equities Corporation[2] while count 5 contains allegations directed to the defendants, Wal-Don Group, Inc., Patrick F. Waldron and James R. Donovan.
In the first count the allegations are that one or more of Merrill Lynch Co., MLAM, MLPF S, Genung and Hyland, hereinafter referred to as the "Merrill Lynch defendants", breached a contract with the plaintiff when, on behalf of the plaintiff, subscription documents were signed for $506,005.95 worth of Colonial Diversified Zero Coupon Bonds in the face amount of $1,300,000.00. The second count refers to several allegations of negligence on the part of one or more of the Merrill Lynch defendants in the acquisition by the plaintiff of the Colonial Diversified Coupon Bonds, including a claim that said purchase was not permitted under the statute governing the investment of trust funds, Gen. Stat. 45a-203 (formerly 45-88). In the third count, the allegations are that in the purchase of the Colonial Diversified Zero Coupon Bonds, one or more of the Merrill Lynch defendants violated the Connecticut Uniform Securities Act (CUSA), specifically Gen. Stat. 36-473 and 36-474.
As for the remaining defendants, the fourth count alleges CUSA violations relating to 36-485 and for 35-498(a)(2) by James Cahill and Colonial Equities Corporation, making them both liable to the plaintiff pursuant to 36-498(c). In the fifth count, the claims are that Wal-Don Group, Inc., by virtue of a trust indenture forming part of the offer of the bonds, became a fiduciary with obligations to the plaintiff that were ignored and that Wal-Don is merely the alter ego of the defendants, Patrick F. Waldron and James R. Donovan.
The Merrill Lynch defendants contend that the plaintiff's claims against all of them are arbitrable because of a provision in the Cash Management Account Agreement between the trustees of the plaintiff's retirement fund, designated in the agreement as the "undersigned", and the defendant, MLPF S. That provision reads as follows:
Agreement to Arbitrate Controversies
 Except to the extent that controversies involving claims arising under the Federal securities may be litigated, the undersigned[3]
agrees that any controversy arising out of the CT Page 10581 business of MLPF S or this Agreement shall be submitted to arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc. as the undersigned may elect. If the controversy involves any security or commodity transaction or contract related thereto executed on an exchange located outside the United States then such controversy shall, at the election of the undersigned be submitted to arbitration conducted under the constitution of such exchange or under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or the Code of Arbitration Procedure of the National Association of Security Dealers, Inc. Arbitration must be commenced by service upon the other of a written demand for arbitration or a written notice of intention to arbitrate, therein selecting the arbitration tribunal. In the event the undersigned does not make such designation within five (5) days of such demand or notice, then the undersigned authorizes MLPF S to do so on behalf of the undersigned.
Fortunately, in considering the question of arbitrability, the court is not confined to the rather open ended allegations of the complaint. The parties have furnished the agreement between the trustees of the plaintiff's retirement fund with MLPF S and the agreement between said trustees, described therein as the plaintiff's Retirement Board, with MLAM. In addition, the Merrill Lynch defendants have submitted an affidavit from John Ruby, a vice-president of MLPF S, and the manager of its Southbury office, and the plaintiff has provided portions of depositions taken of Barbara O'Brien, an employee of MLPF S, and the defendant, Edmund C. Hyland, who works for MLAM. From the evidence presented, the court finds that the facts set forth below are relevant to the issue at hand.
On March 21, 1985, the agreement between the plaintiff's representatives and MLPF S was executed. That agreement is in a CT Page 10582 printed form designated as the "Cash Management Account Agreement for Pension and Profit Sharing Plans." The agreement provides that the cash management account program offers an itemized financial service that links together three components a securities account for the buying and selling of stocks, bonds and the like, a choice of money accounts and a check/card account. With respect to the securities account, the agreement states expressly that MLPF S does not and will not have any discretionary authority or control over the plaintiff's investments and that MLPF S will not serve as a primary and regular advisor regarding the plaintiff's investment decisions.
According to the agreement, cash accumulating in the securities account is to be automatically invested by MLPF S into shares of the money account chosen by the plaintiff. No fees or commissions are to be charged for purchase or redemptions of money account shares. An unspecified affiliate of MLPF S, however, will receive a fee for acting as investment advisor to each of the money funds.
The check/card account requires that a bank approval by MLPF S accept the plaintiff's application to open an account. Checks drawn on such account will be honored to the extent of available funds in the securities account and in the designated money account.
John Ruby, in his affidavit, says that the cash management account agreement with MLPF S was entered into prior to and in connection with the establishment by the plaintiff of an investment advisory agreement with MLAM. The cash management account agreement, however, does not mention or refer in any way to the investment advisory agreement or to MLAM. One provision of the cash management account agreement is that the plaintiff at any time, may withdraw any uninvested balance from its securities account upon notifying its account executive to MLPF S by telephone or letter.
The agreement with MLAM was signed on June 5, 1985. Like the agreement between the plaintiff's representatives and MLPF S, the MLAM contract is also a printed form. Pursuant to its terms, MLAM became the plaintiff's investment advisor and the manager of the securities in the plaintiff's portfolio. This agreement is nondiscretionary. The defendant, Edmund C. Hyland, described a nondiscretionary account as one in which the manager decides that investments should be bought and sold but before any transaction CT Page 10583 can be executed, approval of the customer must be obtained.
In the MLAM agreement several references to MLPF S have been typed in. One clause directs that all transactions be carried out through MLPF S as broker dealer in account 887-058967-05896 which is the number assigned to the plaintiff's cash management account. In another clause, the plaintiff directs that MLPF S shall act as custodian of the assets of the portfolio. The affiliation of MLAM and MLPF S is mentioned throughout the agreement and, in a third clause, the plaintiff authorizes MLAM to establish accounts with other securities dealers if transactions with its affiliate are prohibited by the (federal) Employee Retirement Income Security Act.
It is the MLAM agreement that in addition to establishing the relationship between the plaintiff and MLAM, also imposes obligations on the part of both MLAM and the plaintiff to MLPF 
S. Pursuant to the agreement, MLAM is appointed as the plaintiff's agent and attorney-in-fact to buy, sell or otherwise effect transactions in stocks, bonds and other securities for the plaintiff's account and in its name. This broad grant of authority is qualified, however, by another provision whereby before placing any orders for the plaintiff's account, MLAM is to obtain the plaintiff's consent. In fact, the only disagreement between the written contract and Mr. Hyland's description of a nondiscretionary account is that the written contract provides that consent does not have to be obtained if the investment is in a money market account or the action to be taken is ministerial in nature.
The agreement between the plaintiff and MLAM contains references to the affiliated status of MLAM and MLPF S[4]
but also to the independence of each corporation. MLAM is hired to give advice as to what securities should be bought or sold for the plaintiff's retirement account. MLPF S is to act as the broker in such transactions and as custodian of the securities in the plaintiff's portfolio. The plaintiff's contract with MLAM provides that at no time shall MLAM have physical control of any of the assets of the portfolio. A specific provision in the contract between the plaintiff and MLAM is that notwithstanding its affiliation with MLPF S, MLAM "is exclusively responsible for the performance of its duties and any liabilities to the [plaintiff] arising under this [a]greement or otherwise."
I. CT Page 10584
Generally, whether parties to a contract have agreed to arbitrate their disputes presents a question of fact. A.T.T. Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 6649, 206 S.Ct. 1415, 89 L.Ed.2d 648 (1986). A. Dubrevil Sons, Inc. v. Lisbon, 215 Conn. 604, 608 (1990). The plaintiff, however, has raised two defenses to the requested arbitration that the court interprets as defenses in law. First, the plaintiff claims that the method chosen to raise the arbitration question — a motion to compel arbitration and stay proceedings — is an improper procedure.[5] Second, the plaintiff contends that its CUSA claims in the third count of the complaint, as a matter of law, can be tried only in a "judicial" forum.
Regarding these claims and other issues, the plaintiff and the Merrill Lynch defendants seemingly have agreed that their dealings affect interstate commerce and come under the Federal Arbitration Act (F.A.A.) 9 U.S.C. § 1-14, inclusive. Section 2[6]
of the F.A.A. embodies a substantive rule applicable in state as well as federal courts, whereby Congress acting under the Commerce Clause[7] foreclosed state legislatures from undercutting the forceability of arbitration agreements. Southland Corporation v. Keating, 465 U.S. 1, 16, 104 S.Ct. 582, 79 L.Ed.2d (1984). But the F.A.A. contains no express preemptive provision nor does it reflect a congressional intent to occupy the entire field of arbitration. Volt Info Sciences v. Board of Trustees of the Leland Stanford University, 487 U.S. 468, 477, 109 S.Ct. 1248,103 L.Ed.2d 488 (1989). Therefore, even when the F.A.A. is applicable, state law still may be utilized in arbitration matters subject to preemption only to the extent of an actual conflict with federal law. Fahnestock Co. Inc. v. Waltman, 935 F.2d 512
(2d Cir.) cert. denied 112 S.Ct. 380, 116 L.Ed.2d 381
(1991). Specifically, the procedures outlined in 4 of the F.A.A. for raising the question of whether an agreement is arbitrable apply only to actions in the federal district courts. Southland Corporation v. Keating, supra at 16 and n. 10.
The plaintiff's objection to the motion of the Merrill Lynch defendants concerns Gen. Stat. 52-410.[8] Under that section, an application for an order of arbitration is supposed to be initiated by a writ of summons and a complaint. Instead of using52-410, the Merrill Lynch defendants followed 52-409, which states that if an action is brought by a party to a written agreement to arbitrate, the court, on motion by any party to the agreement, may stay the action until an arbitration has been had. CT Page 10585
In Zarchen v. Union Equipment Co., 20 Conn. Sup. 44, 45
(1956), the requirements of a summons and complaint were determined to be mandatory. Zarachen however, was a situation where the movant for arbitration was the plaintiff who had brought the suit. Of more recent date is KND Corporation v. Hartcom, Inc., 5 Conn. App. 333, 336-37 (1985) where the Appellate Court said "[i]t would make little sense to require a party being sued to initiate an [52-410] action" and sanctioned a 52-409 motion when the issue of arbitration was injected into a case by a defendant. The decision in KND Corporation v. Hartcom, Inc. prevents the court from considering Zarchen v. Union Equipment Co. as persuasive authority.
The plaintiff's second point is that similarity in language between the Connecticut Uniform Securities Act (CUSA) and federal securities legislation should mean that arbitration of the CUSA cause of action is prohibited. Apparently, the source for this argument is Wilko v. Swan, 346 U.S. 427, 434, 74 S.Ct. 182,98 L.Ed. 18 (1953), wherein a section of the Securities Act of 1933,15 U.S.C. § 77n invalidating any stipulations waiving the Act's provisions was interpreted to prohibit the operation of a predispute arbitration clause. More than thirty years later, however, in Shearson/American Express, Inc. v. McMahon, 482 U.S. 220,234, 107 S.Ct. 2332, 96 L.Ed.2d 185 reh. denied 483 U.S. 1056,108 S.Ct. 31 (1987) the Supreme Court refused to place the same construction on essentially identical language in the Securities Exchange Act of 1934, 15 U.S.C. § 78cc (a). And, in Rodriguez De Quijas v. Shearson/American Express, Inc.,109 S.Ct. 1917, 1922 (1989), Wilko v. Swan was overruled. At the present time no federal statute prevents or renders ineffective a predispute arbitration agreement between a broker and an investor.
Obviously, Rodriguez De Quijas v. Shearson/American Express, Inc. supra is controlling authority for the present controversy. That decision was issued on May 15, 1989, two and one-half months before the Colonial Diversified Zero Coupon bonds were purchased. Further, the decision is retroactive, 109 S.Ct. at 1922. If the motion to compel arbitration rests on sound grounds, neither of the two foregoing claims provides an effective reason to deny it.
 II.
Arbitration is a creature of contract. A person cannot be compelled to arbitrate a dispute unless he has agreed to do so. CT Page 10586 A. T. T. Technologies, Inc. v. Communications Workers, 475 U.S. 643,648, 106 S.Ct. 1415, 89 L.Ed.2d 648, 655 (1986) (quoting Steelworkers v. Warrior Gulf Navigation Co., 363 U.S. 574, 582,80 S.Ct. 1347, 4d Ed.2d 1409 (1960)). The question of what persons or entities are bound by an arbitration agreement affecting interstate commerce is, as previously stated, one of federal law. Since the question involves general concepts of contracts and agency, federal courts have looked to state law in determining what the federal law of contracts or agency is or should be. Flink v. Carlson, 856 F.2d 44, 46 and n. 3 (8th Cir. 1988). Questions concerning arbitrability, however, are to be examined from the point of view that favors arbitration. Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc.,473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed. 444 (1985).
Here of course, the dispute as to arbitrability is between the plaintiff, a signatory to a contract containing an arbitration clause, and four non-signatories Merrill Lynch Co., MLAM, MLPF S' vice-president Genung and MLAM's vice-president Hyland. The non-signatories predicate the claim for arbitration upon their relationship with MLPF S the other signatory.
In certain situations, courts have deemed non-signatories to a contract containing an arbitration clause to be parties to the contract for purposes of the F.A.A. Merrill Lynch Commodities, Inc. v. Richall Shipping Corporation, 581 F. Sup. 933, 940
(S.D.N.Y. 1984). These instances are principally an agency relationship between a signatory and a non-signatory as was found in Okcuoglu v. Hess, Grant Co., Inc., 580 F. Sup. 749, 751-52
(E.D.Pa. 1984), or a contract whereby the non-signatory was made a third party beneficiary as in Cauble v. Mabon Nugent Co.,594 F. Sup. 985, 992 (S.D.N.Y. 1989) or where the non-signatory is, in effect, the alter ego of a signatory, see Fisser v. International Bank, 282 F.2d 231, 234 and n. 6 (2d Cir. 1960) or where the contract incorporated by reference another contract to which the non-signatory is a party. Cianbro Corporation v. Empressa Nacional de Ingenieria v. Technologia, S.A., 697 F. Sup. 15,18 (D.Me. 1988). All of these cases were decided on their own peculiar facts and with a view of ascertaining the intent of the contracting parties. The intent of the contracting parties becomes all-important when a non-party seeks to take advantage of the contractual language. See Mowbray v. Moseley, Hallgarten, Estabrook Weeden, 759 F.2d 1111, 1117 (1st Cir. 1986).
Okcuoglu v. Hess, Grant Co., Inc., supra was decided upon CT Page 10587 the relationship that the introducing broker had with both the customers and the clearinghouse brokers. The introducing broker approved the customer for options trading through one clearinghouse, thus acting as that clearinghouse's agent and was authorized by the customers to execute the form by which their options trading was continued at the second clearinghouse. The forms used by both clearinghouses contained arbitration clauses and the introducing broker was permitted to invoke each of them as agent for the first clearinghouse and as agent for the customers when the form of the second clearinghouse was signed.
In Cauble v. Mabon Nugent Co., supra the futures contract between the customer and the clearinghouse broker contained a clause that if the customer's account did not contain the amount of margin required the broker could without notice liquidate the customer's open positions or take what other action it deemed necessary. Cauble was a situation where, although the customer's account was nondiscretionary, the introducing broker had supervision over the account including authority to collect margins for the clearinghouse broker who did nothing more than clear trades. The court in Cauble was of the opinion that the services rendered by the introducing broker of which the customer and clearinghouse broker were fully aware shared an interest in their part to regard the introducing broker as a third party beneficiary so that it too could sell the customer's interests if proper margins were not maintained.
Differences exist between the two decisions supporting an agency or third party beneficiary status for the so-called introducing broker[9] and the present case. Previously noted was the omission in the plaintiff's contract with MLPF S of any reference to MLAM. Some courts have found that such omission alone is indicative of an intent not to include the advising broker in the arbitration agreement between the customer and clearinghouse broker. See Wilson v. D.H. Blair, 731 F. Sup. 1359,1362 (N.D.Ind. 1990). Parenthetically nothing in John Ruby's affidavit rebuts this inference. Moreover the differences appear in the plaintiff's agreement with MLAM as the following facts show. In that contract the plaintiff agreed to indemnify MLPF S for any loss or damage sustained as a result of following MLAM's instructions. MLAM itself, however, would be liable, according to the contract for losses to the plaintiff that were caused through its negligent, willful or reckless misconduct or its violation of some applicable law. By virtue of its agreement, MLAM became substituted for the plaintiff in dealing with MLPF 
CT Page 10588 S. But this status is not indicative of an intent to include MLAM and other Merrill Lynch defendants in the arbitration clause of the previously executed MLPF S agreement. McPheeters v. McGinn, Smith Co., Inc. 953 F.2d 771 (2d Cir. 1992). Especially so, in this case, where the defendant Hyland, who managed the plaintiff's account at MLAM, testified in deposition that he had never seen the plaintiff's agreement with MLPF S before.
The Merrill Lynch defendants do not claim to be alter egos of each other. For a court to be able to find that one party is the alter ego of another, there must be proof of control in the case of a corporation not mere majority or even complete stock control, but complete domination, not only of finances, but of policy and business practices respecting to the transaction at issue so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own. Fisser v. International Bank, 202 F.2d 231, 238 (2d Cir. 1960); Coastal States Trading Inc. v. Zenith Navigation S.A., 446 F. Sup. 330,336-37 (S.D.N.Y. 1977); see Dighello v. Busconi 673 F. Sup. 85
-87 (D.Conn. 1987) aff'd. mem. 849 F.2d 1487 (2d Cir. 1988).
Only obliquely do the Merrill Lynch defendants argue for incorporation by reference of the plaintiff's agreement with MLPF S into the plaintiff's agreement with MLAM. The court rejects the argument. The MLAM agreement purports to appoint MLPF S as the closing broker and designates the plaintiff's account with MLPF S by number. These acts had already happened as a result of the plaintiff's agreement with MLPF S. In any event, a recital of some previously accomplished items is not sufficient evidence of an intention to incorporate by reference the provisions of one agreement into the other. See Ciambro Corporation v. Empressa Nacional de Ingenieria v. Technologic, supra at 18; Coastal States Trading, Inc. v. Zenith Navigation, S.A., supra at 338.
The principal contention of the Merrill Lynch defendants is that the arbitration claim is sufficiently broad to encompass the plaintiff's claims against all of them in that the transaction giving rise to the suit arose out of the business of MLPF S. Again, the court must disagree. The wordage in question is "the undersigned agrees that any controversy existing out of the business of MLPF S or this agreement shall be submitted to arbitration." When the account was executed the duties as well as the business of MLPF S was to buy and sell securities as the plaintiff and subsequently MLAM requested. In the agreement, MLPF CT Page 10589 S precluded itself from exercising discretionary authority or giving advice. A review of the amended complaint shows the gravamen of the plaintiff's suit to be lack of proper advice, lack of informed consent and improper management of the plaintiff's portfolio. If these allegations are proved, MLAM, at least, will be liable because of the functions assigned to it in its contract with the plaintiff. In the court's view, the arbitration clause does not encompass MLAM's functions and does not extend beyond MLPF S and Frederick. M. Genung, its vice-president. See McPreeters v. McGinn Smith Co. Inc., supra at 773: Mowbray v. Mosley, Hallgarten Estabrook Weeden, supra at 1117.
To be sure some of the plaintiff's allegations, particularly those concerning agency, go against its present opposition to arbitration. See J.J. Ryan Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir. 1988). On the issue of arbitrability however, the Merrill Lynch defendants are the proponents with the burden of persuasion. Except for the obvious situations of MLPF S and Genung, the burden was not satisfied.
 III.
The F.A.A. requires that arbitrable claims be severed from non-arbitrable claims even though such action will promote piece-meal resolution. Dean Whitter Reynolds v. Byrd, 470 U.S. 213,221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). The motion to compel arbitration and stay proceedings is therefore granted to the extent of the plaintiff's claims against MLPF S and Frederick M. Genung. The claims ruled arbitrable, however are themselves stayed until completion of the trial of the non-arbitrable claims. In this way the court seeks to prevent the arbitration hearing from having any preclusive effect on the litigation of the nonarbitrable claims. See Dean Whitter Reynolds v. Bird, supra at 222-223.
BARNETT, J.